STATE of Minnesota, Respondent,

v.

Bertram M. STRIMLING, Appellant,

P. George Hedlund, Appellant.

Nos. 47542, 47543.

Supreme Court of Minnesota.

March 10, 1978.

Rehearing Denied March 29, 1978.

Thomson, Nordby & Peterson and Jack S. Nordby, St. Paul, for appellants.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Kent G. Harbison and Richard G. Evans, Sp. Asst. Attys. Gen., Theodore J. Collins, Sp. Counsel, Thomas L. Fabel, Deputy Atty. Gen., St. Paul, for respondent.

TODD, Justice.

Defendants Bertram M. Strimling and P. George Hedlund are longtime partners who have jointly owned and operated a number of business entities in the health care industry. As a result of an investigation into the books and records of the River Villa Conva-

lescent Medicenter (River Villa), owned by defendants, both men were indicted by a Hennepin County grand jury. Strimling was charged with two counts of violating Minn.St. 609.465, and with two counts of violating Minn.St. 300.60. Hedlund was charged with one count on each of the same two offenses. The case was tried to a jury, which found defendants guilty on all counts. We affirm.

The criminal conduct for which Strimling and Hedlund were indicted arose primarily out of the operation of River Villa, a nursing home constructed by defendants in 1972. The nature of the offenses for which defendants were convicted requires that the structure of their business enterprises be set forth in substantial detail.

During the years of their association, Strimling and Hedlund have developed a cluster of closely related companies, the business purpose of which was to provide health care for the elderly. Together, defendants have owned and operated a number of nursing homes and several other companies which furnish support services to nursing homes. Both Strimling and Hedlund were recognized as experts in the health care industry, having served on the Minnesota Board of Health and the Metropolitan Health Council respectively.

River Villa's assets and physical plant were owned by 27th Avenue S. E., Inc., a business in which Strimling and Hedlund were the sole officers and stockholders. Rather than operate the home themselves, defendants leased it to Thornton Care, Inc., a nonprofit corporation which they had organized. The nominal officers of Thornton Care, Inc., were Donald Krietzman and Allan Hartkopf.[1] These men served as administrator and assistant administrator of River Villa and were responsible for the day-to-day operation of the facility. Both Krietzman and Hartkopf had been employed by defendants for a period in excess of 10 years. They also owned and operated Minnesota Rentals, a firm which sold medical and other supplies to nursing homes.

Other entities also played a role in defendants' scheme. Strimling and Hedlund were the sole owners of Health Maintenance Associates, a health-care consulting firm. The two also jointly owned the Washington Development Company, the Adams Development Company, and Taylor Electronics. The electronics firm provided telephone and television service to River Villa residents. In addition, Strimling, Hedlund, and Hartkopf were equal partners in the Jefferson Development Company and the Jackson Development Company.

The charges against defendants were grounded in their repeated practice of fraudulently extracting certain assets from the River Villa operation and diverting them to personal use. The grand jury and a trial jury found that this conduct violated two penal provisions of Minnesota law.

First, the value of the assets diverted by defendants ultimately appeared in River Villa's books of account as artificially increased operating costs. River Villa's inflated cost of doing business was in turn reflected in its mandatory report of costs to the Department of Public Welfare (DPW). This report, as required by Minn.Reg. DPW 49 (hereafter Rule 49), played a key role in the prosecution of Strimling and Hedlund and requires a brief digression for additional explanation.

A large portion of nursing home patients in Minnesota cannot afford to pay for the care they receive. The DPW has therefore established a procedure pursuant to which nursing homes are reimbursed from welfare funds for the services they provide to low-income patients. Under the procedure, every nursing home in the state files an annual report which contains a figure representing the cost per patient per day of operating its facilities. Reimbursement to each home is made on the basis of its per diem cost figure. Thus, higher per diem costs result in an increased rate of subsidization, subject to a ceiling figure imposed by the DPW. The accounting practices to be fol-

---

1. Frances Sorenson was also an officer of Thornton Care, Inc., until her resignation in 1974. She appeared as a witness at trial but is otherwise not involved in this prosecution.

lowed in making the requisite cost calculations are set forth in Rule 49.[2]

The Rule 49 report submitted by River Villa to the DPW in 1974 was false as it contained the inflated costs generated by defendants' fraudulent activities. The submission of knowingly inaccurate reports to governmental agencies is a criminal offense under Minn.St. 609.465, which provides:

"Whoever, with intent to defraud, presents a claim or demand, which to his knowledge is false in whole or in part, for audit, allowance or payment to a public officer or body authorized to make such audit, allowance or payment is guilty of an attempt to commit theft of public funds and may be sentenced accordingly."

Strimling and Hedlund did not personally sign or file the report in question and for that reason could not be charged with a direct violation of § 609.465.[3] Instead, the indictments treated defendants as aiders and abettors of the primary illegality and implicated them under the complicity provisions of Minn.St. 609.05, which provides in part:

"Subdivision 1. A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

"Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by him as a probable consequence of committing or attempting to commit the crime intended."

The second statutory violation arising out of defendants' operations is more straightforward. Minn.St. 300.60 provides:

"The diversion of corporate property to other objects than those specified in the recorded and published certificate, where injury to any individual results therefrom, the declaring of dividends when the profits are insufficient to pay the same or when the funds remaining will not meet the corporate liabilities, or any intentional deception of the public or individuals in relation to its means or liabilities, are felonies, and every person guilty of any one of them shall be punished by a fine of not more than $5,000 or by imprisonment in the state prison for not more than three years, or by both."

The state contends that defendants' diversion of River Villa's assets to personal ends fell directly within the proscription of § 300.60.

The specific acts underlying the above-described offenses may be divided into two unrelated patterns of inculpatory conduct. The first concerns Strimling only and forms the basis for counts 1 and 2 of the consolidated indictment. The second scheme involves both Strimling and Hedlund and produced the joint charges against them contained in counts 3 and 4 of the indictment. In the interest of clarity, we will discuss the two sets of facts separately below.

*Counts 1 and 2.* During the development stage of River Villa, Strimling selected Puritan Textiles (Puritan), a subdivision of Pink Supply Company, to provide the interior furnishings for River Villa. This business association with Puritan generated illicit benefits to Strimling in essentially three ways:

(1) When purchasing the original furniture and equipment for River Villa, Strimling ordered a number of items for his personal use and instructed Puritan to bill the cost of these items to River Villa.[4] This practice continued after River Villa had begun operating, with Strimling purchasing a variety of furnishings for his home, office,

---

2. For a more detailed discussion of the Rule 49 cost reporting system, see our recent decision in *State v. Ruud,* Minn., 259 N.W.2d 567 (1977).

3. River Villa's Rule 49 report was prepared by its accountants and signed and submitted by Krietzman. The accounting firm had no knowledge of defendants' illegal actions.

4. It appears that the first set of personal items was paid for by 27th Avenue S. E., Inc., and not by River Villa. There is some dispute as to whether the cost of the items was ever indirectly reflected in River Villa's Rule 49 report in the form of higher lease payments made by Thornton Care, Inc., to 27th Avenue S. E., Inc.

cabin cruiser, and Florida condominium. Whenever Strimling ordered personal items, Puritan would invoice them to River Villa and purposely misdescribe the merchandise as various types of nursing home equipment. The false invoices were coded by Puritan with the letters "S" and "K"—indicating personal purchases by either Strimling or Krietzman.

(2) Strimling also utilized a second scheme to extract cash from the River Villa operation with the cooperation of Puritan. In 1971, Puritan entered into a consulting contract with Health Maintenance Associates, another of defendants' companies, ostensibly for the purpose of providing Puritan with the opportunity to furnish two other nursing homes which were under construction at that time. Strimling, however, did not provide any consulting services but was nevertheless paid $1,000 per month under the contract. Puritan raised this money by inflating the cost of items it was then selling to River Villa. This system of overbilling River Villa and paying the excess to Strimling was established at Strimling's specific suggestion.

(3) Before the first consulting contract expired, Strimling suggested that a second contract be entered into, paying him $1,500 per month. Strimling apparently represented that because of his position on the Minnesota Board of Health he would be able to direct a substantial volume of nursing home business to Puritan. A new contract was subsequently executed in accordance with Strimling's request. Shortly thereafter, however, Puritan informed Strimling that since he had provided no new business, Puritan could not afford to continue the $1,500 monthly payments. At that point, Strimling suggested that Puritan secure the necessary funds by forwarding totally false invoices to River Villa for payment. Puritan complied and billed River Villa for equipment which was neither ordered by nor delivered to anyone. Strimling instructed Krietzman, River Villa's administrator, to pay the phony invoices.

In connection with these kickback schemes, Strimling alone was charged under count 1 with presenting false claims to a public body (§ 609.465), and under count 2 with the diversion of corporate property (§ 300.60).

*Counts 3 and 4.* Prior to their River Villa venture, Strimling and Hedlund owned several nursing homes and employed Krietzman and Hartkopf to operate them. These homes were eventually sold to Monterey Life Systems (MLS), an Ohio corporation. All four men were kept on as local employees of MLS until 1972, at which time MLS filed a civil action naming the four men as codefendants. The complaint charged that Krietzman and Hartkopf had sold supplies to the MLS homes through their company, Minnesota Rentals, and had fraudulently overcharged MLS for the supplies. The suit also sought restitution of $25,000 advanced to the four men by MLS for architectural services which had never been provided.

In April 1973, Strimling, Hedlund, Krietzman, and Hartkopf entered into a settlement agreement with MLS which required a total payment of $55,000. The agreement provided in part that each of the four would make a cash payment at the execution of the agreement. Promissory notes were also given which jointly and severally obligated each of them to make annual payments of $2,500.

While standing outside the attorney's office after having executed the agreement with MLS, Krietzman expressed concern to the group over his ability to make the annual $2,500 payments. In response, Strimling suggested that the money be raised from River Villa's suppliers. Ultimately, three suppliers—Purity-Ohleen Dairy, Osseo Meat Market, and Sunny Acres Produce—participated in Strimling's suggested scheme. Every month each supplier would bill River Villa for considerably more food than was actually delivered. The bills were paid in full by River Villa, and each supplier would rebate the excess charge in cash. Krietzman collected the excess cash from the dairy and delivered it to Strimling at their

frequent breakfast meetings. Hartkopf did the same with the cash received from the meat supplier; and Strimling arranged for the produce rebates himself. When settlement payments were due under the MLS agreement, Krietzman and Hartkopf would each receive a check from defendants' Washington Development Company to enable them to make their annual payments.

The funneling of funds through suppliers to Strimling and Hedlund personally resulted in the indictment charging them jointly with presenting false claims to a public body (count 3) and with diversion of corporate property (count 4).

River Villa's Rule 49 cost report which provided the cornerstone of the state's case was filed with the DPW on October 1, 1974. Certain irregularities in the report triggered a field audit by the DPW, which in turn led to the issuance of search warrants and the seizure of River Villa's business records and files. On May 9, 1975, a grand jury was impaneled to consider the information uncovered in the execution of the search warrants. Hedlund testified before this grand jury but refused to waive his Fifth Amendment rights with respect to any attempt to prosecute him stemming from his testimony.

The grand jury returned six indictments based on the River Villa operation, two of which charged Krietzman and Hartkopf with offenses growing out of their conduct as administrators of River Villa. Counsel for Krietzman and Hartkopf negotiated an agreement with the prosecution which provided that the two men would plead guilty as charged to one count and would be sentenced to 5 years and placed on probation. In return, the two agreed to cooperate with the state in its continuing investigation of River Villa. The information which was subsequently revealed by Krietzman and Hartkopf implicated Strimling and Hedlund in the kickback schemes described above. Testimony concerning this newly discovered evidence was heard by a second grand jury which had already been impaneled to investigate an unrelated matter. The indictments at issue in this case were returned by the second grand jury on December 19, 1975.

On February 9 and 10, 1976, a joint omnibus hearing was conducted, and on March 22, 1976, the state's motion for a joint trial of Strimling and Hedlund was granted over the objections of both counsel for defendants.[5] After a trial lasting from April 5 to May 6, 1976, the jury returned verdicts of guilty against both defendants as charged. The trial court fined Strimling $15,000 and sentenced him to a 2½-year prison term on counts 1 and 3, to run concurrently with a 3-year term on counts 2 and 4. Hedlund was fined $7,500 and was sentenced to concurrent 2½-year and 3-year terms on counts 3 and 4. Defendants' postverdict motions were denied by the trial court, whereupon notices of appeal to this court were filed.

On appeal, Strimling and Hedlund raise three issues for our consideration:

(1) Did the state adduce sufficient evidence at trial to prove the appellants guilty beyond a reasonable doubt of the offenses charged?

(2) Did the trial court commit reversible error by granting the state's motion for a joint trial over defendants' objections?

(3) Was defendant Hedlund immune from prosecution in connection with the River Villa operation by virtue of his previous testimony before the first grand jury?

■ 1. Defendants concede, as they must, that they bear a heavy burden when requesting this court to reverse the factual findings of the jury. We have frequently reiterated the deference which will be accorded a jury's findings, and it is well settled that if, on the basis of the evidence in the record, a jury could reasonably have found as it did, this court will not upset the jury's conclusion. In making this determination, the court must consider the evidence in the light most favorable to the jury

---

5. Defendants were represented by different attorneys at trial but are jointly represented on appeal.

verdict and assume that the jury did not believe the testimony which was inconsistent with the result it reached. *Ruskamp v. Fernkes,* Minn., 261 N.W.2d 612 (1978); *State v. Hawkins,* Minn., 260 N.W.2d 150 (1977); *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966); *State v. Norgaard,* 272 Minn. 48, 136 N.W.2d 628 (1965).

Defendants first argue that there is insufficient evidence to support their convictions on the charge of presenting false claims to a public body. They note that Krietzman was primarily responsible for the preparation of the Rule 49 report, that he signed it, and that there is no evidence that either of the defendants was specifically aware of the contents of the report. Because the only evidence linking defendants to the false report is circumstantial, it is urged that there could not have been sufficient proof upon which to base a verdict of guilty.

■ Defendants overlook the fact, however, that their conviction was for aiding and abetting the filing of a false claim. We have previously held that under § 609.-05 a person may be held criminally liable as an aider and abettor without actively participating in the overt act constituting the primary offense. Where the accused plays at least some knowing role in the commission of the crime and takes no steps to thwart its completion, the jury may properly infer the requisite mens rea for a conviction of aiding and abetting. See, *State v. Parker,* 282 Minn. 343, 164 N.W.2d 633 (1969); *State v. Bellecourt,* 277 Minn. 163, 152 N.W.2d 61 (1967).

In this case, it is obvious that in the absence of defendants' illicit conduct, River Villa's Rule 49 report would not have been false. Defendants' role in the report's inaccuracies is thus manifest. The evidence clearly indicates that Strimling was the originator of both the Puritan-invoice scheme and the supplier-rebate scheme. Although Hedlund was not involved in the Puritan-invoice scheme, he was present when the supplier-rebate plan was first proposed and could be found to have implicitly approved of it. Moreover, Krietzman and Hartkopf testified at trial that after the River Villa investigation had begun, Strimling, Hedlund, Krietzman, and Hartkopf took an extended automobile ride together during which Hedlund recommended that the four "stick together" on the supplier-rebate scheme and lie about the use of the rebated cash in the event that any inquiry concerning it was made.

■ Strimling and Hedlund, of course, could not be convicted as aiders and abettors under § 609.05, in the absence of proof of their knowing connection with the false Rule 49 report. Our reading of the trial record persuades us that there was more than ample evidence from which the jury could have inferred defendants' knowledge of the Rule 49 cost reporting procedure. Strimling was a recognized expert in the field of health care for the elderly, having operated a series of nursing homes for over 15 years. He was also a member of the Minnesota Board of Health, and there is evidence that he specifically discussed the Rule 49 regulations both with his accountants and with a banker. Hedlund's expertise was nearly equal to Strimling's. He had been the latter's partner in each nursing home operation. Hedlund was also an attorney and sat on the Metropolitan Health Council. Under circumstances such as these, where a defendant's undisputed professional expertise must tell him that his actions will result in the commission of an offense by a subordinate, it would be manifestly unjust to allow the defendant to insulate himself from criminal liability by suggesting he did not necessarily intend that which he knew to be inevitable. The jury so found, and we think their conclusion is well supported by the evidence.

■ Defendants also refer us to several decisions holding that a corporate officer will not be held liable for the illegal actions of corporate employees unless such actions were undertaken with the express authorization or approval of the officer. It is argued that the evidence before the jury did not establish the existence of any such

authorization or approval by either defendant of the falsehoods contained in the Rule 49 report. However, this maxim and the cases in which it has been applied are inapposite here. The "authorization-or-approval" rule is intended to place a limitation on corporate officers' vicarious liability under the respondeat superior doctrine, recognizing that the criminal acts of a subordinate may not be justly attributed to a corporate officer unless the latter was in some sense responsible for the acts. By contrast, the operation of § 609.05 in the present case is not dependent upon any sort of principal and agent relationship. Instead, it imposes direct liability on anyone who with the requisite intent contributes meaningfully to the overtly criminal conduct of another person. Under the statute, the fact that defendants did not expressly authorize or approve the false report does not bar a finding of criminal liability, so long as the jury could reasonably have concluded that defendants provided the necessary aid with the knowledge and mental state required by the statute. As previously stated, we believe such a finding to be entirely proper on the facts of this case.

■ With respect to their convictions for the diversion of corporate property, defendants raise three additional points. Although couched in sufficiency-of-the-evidence language, these remaining arguments in actuality are directed toward the applicability of § 300.60 in the first instance.[6] Defendants first observe that § 300.60 imposes liability for the diversion of corporate property only when "injury to any individual results therefrom," and contend that no such "injury" was proved by the state. It is not disputed, however, that at the time of trial creditors held approximately $200,000 in unsatisfied debts against River Villa. Defendants nevertheless argue that their schemes for extracting River Villa's funds did not cause this indebtedness and that, in any event, the existence of unpaid creditors is not the type of injury which the statute contemplates. We disagree. The language of the statute clearly manifests a legislative attempt to ensure that no deception concerning a corporation's ability to meet its liabilities be allowed to develop. Indeed, there are generally only two groups of individuals who are capable of being injured by the diversion of corporate property—creditors and stockholders. Thus, to the extent that defendants' diversion of River Villa's funds left insufficient assets to meet the demands of its creditors, we hold that injury to an individual occurred within the meaning of § 300.60.

Defendants next assert that because they were technically not officers of Thornton Care, Inc., the corporation which operated River Villa, they could not have violated § 300.60. Defendants suggest the statute "would seem to apply only to such persons who are in a legal, fiduciary relation to the corporation," because only those persons "would be in a position to direct dividends improperly or deceive the public as to the corporation's financial condition." The facts of this very case bespeak the shortsightedness of this contention. Here, defendants were able to divert substantial sums to their own benefit in spite of the fact that neither of them had any official position in the company which operated River Villa.

■ In the realm of closely held corporations, the role of the silent strong man is a familiar one. The statute recognizes this common phenomenon by not expressly restricting its language to officers, directors, employees, or the like.[7] When the simplest construction of the statute covers the facts here present, we would be particularly ill-

---

**6.** Lest we be misunderstood, the evidence clearly demonstrates that defendants withdrew corporate funds for personal use. Only the scope of § 300.60 is at issue.

**7.** It is worthy of note that the legislature was apparently aware of the broad language enacted in § 300.60. The only other penal provision contained in Minn.St. c. 300 is Minn.St. 300.61.

In contrast to § 300.60, § 300.61 expressly applies only to "[e]very officer, agent, or employee of any corporation." It is thus apparent that had the legislature desired to similarly restrict the application of § 300.60, as defendants suggest, it was aware of the means for so doing.

advised to adopt an interpretation which would allow a person in either Strimling's or Hedlund's position to insulate himself from liability under the statute merely by making certain that he is not formally designated as an official of the corporation whose property he wishes to divert.

■ Finally, defendants contend that even if they did divert corporate properties for personal gain, their actions were taken with the full knowledge and approval of Krietzman, the president of Thornton Care, Inc., and were thus impliedly ratified by the corporation. Again, we are unpersuaded. For even assuming, without deciding, that the other elements of an implied ratification were present,[8] it is axiomatic that no corporation can make legal by ratification that which was illegal from the outset. Criminal conduct is defined and punished by the state, and it would be absurd to suggest that a corporation as principal could displace the state's powers and absolve its agent from liability for his criminal actions merely by ratifying them. See, 19 Am.Jur.2d, Corporations, § 1251.

In sum, then, we find that § 300.60 was fully applicable to defendants' conduct and that the evidence more than adequately supports the jury's verdict on all counts.

2. As noted above, the state's motion for a joint trial was made over the objection of both counsel for the defendants. The order of the trial court granting this motion, dated March 22, 1976, is not accompanied in the record before us by any explanatory memorandum. In their post-trial motions, however, defendants cited the trial court's refusal to allow separate trials as one of several grounds for their request for a new trial. The motions were denied by the trial court in an order dated November 18, 1976, to which was appended a lengthy memorandum discussing each of defendants' assignments of error. In that memorandum, the trial judge reaffirmed his earlier ruling on the motion for a joint trial and reiterated the factors which motivated that ruling, as follows:

" ' * * * Interests of justice; hardships and possible disablement of the witnesses if separate trials were required; the time and expense of separate trials; the nature and complexity of the proof involved in these so-called "white collar" crimes; and the lack of any demonstrated or inferential substantial prejudice to the defendants who were joint ventur[ers] in "River Villa" and other business enterprises.' "

All of the proceedings in this case were conducted under the revised Rules of Criminal Procedure. Rule 17.03, subd. 2, provides:

"(1) *Felony and Gross Misdemeanor Cases.* When two or more defendants shall be jointly charged with a felony, they shall be tried separately provided, however, upon written motion, the court in the interests of justice and *not solely related to economy of time or expense* may order a joint trial for any two or more said defendants. In cases other than felonies, defendants jointly charged may be tried jointly or separately, in the discretion of the court. In all cases any one or more of said defendants may be convicted or acquitted." (Italics supplied in part.)

The comments to Rule 17 elaborate on the terms of the rule, as follows:

"Under Rule 17.03, subd. 2, the general rule is that defendants jointly charged with a felony shall be tried separately. However, the court in the interests of justice and not solely related to economy of time or expense may order joinder. It shall be considered an abuse of discretion for a trial judge to refuse to grant a joinder where the interests of justice so require."

Defendants take the position that the only factors justifying their joint trial were those "solely related to economy of time or expense" which are prohibited under Rule 17.03, subd. 2(1). In view of the nature of this prosecution, however, we think defendants read Rule 17 too narrowly. While we do not retreat from our recent statement

---

**8.** See, 2 Fletcher, Cyclopedia Corporations (1969 Rev.Vol.) §§ 767, 768.

that separate trials "should be the rule rather than the exception," *State v. Duncan*, Minn., 250 N.W.2d 189, 198 (1977), we hold that the presumption in favor of separate trials was overcome on the facts of this case.

Although Rule 17.03 is unquestionably designed to help guarantee criminal defendants a fair trial, the "interests of justice" to which the rule makes reference also require that the state, representing the collective interest of the people, be afforded a fair chance to present its case. Much of the state's case at trial depended on the testimony of several of defendants' business associates—witnesses who were at best sympathetic toward defendants and at worst openly hostile toward the prosecution. It would be naive to think that the opportunity for such witnesses to rehearse and compare notes following a first trial would not affect the state's proof in a second trial. As the trial judge stated in his memorandum:

> " * * * The evidence thus described could not reasonably be expected to be available in two trials because of the number of contingencies affecting the various witnesses involved in the matter, its inherent complications and the demonstrated reluctance of two of the witnesses * * * to testify consistently regarding significant and material facts."

Also, in a prosecution for a "white-collar" crime where the defendants have acted in concert to spin a complex web of legal and illegal entrepreneurial activity, we think justice requires that the members of the jury be confronted with both participants in order to facilitate their fullest comprehension of the alleged wrongdoing and the accompanying proofs and defenses. We conclude, therefore, that a joint trial was not only allowable, but also well-suited to the unusual demands of this prosecution.

As a final observation, we note that defendants did not suffer any substantial prejudice as a consequence of the joint trial. Strimling and Hedlund presented no inconsistent defenses and routinely adopted one another's motions and arguments. Neither defendant had exculpatory testimony to offer the other which was precluded by the joint trial. See, *State v. Swenson*, 301 Minn. 199, 221 N.W.2d 706 (1974); *State v. Martineau*, 257 Minn. 334, 101 N.W.2d 410 (1960). It is true that certain testimony at trial was admissible as to one defendant and hearsay as to the other; however, the jury was carefully cautioned to consider only the evidence properly admissible against each defendant. We have carefully reviewed the record and find that even if the jury disregarded the court's instructions, the relatively small quantity of hearsay testimony admitted was entirely cumulative and without prejudice.

Hedlund argues that his individual defense was impaired because the jury heard evidence on counts 1 and 2 which pertained only to Strimling's misconduct and which concerned actions in which Hedlund took no part. It is asserted that Hedlund's conviction was to a significant extent the product of a spillover effect caused by the added bulk of the evidence relevant only to Strimling's guilt. If we agreed that the jury in this case was unable to separate the evidence as it applied to each defendant, we would undoubtedly find Hedlund's contention more forceful. See, *State v. Nutley*, 24 Wis.2d 527, 129 N.W.2d 155 (1964). As it is, however, the criminal conduct underlying counts 1 and 2 (Puritan invoices and consulting contract) was clearly separate from that involved in counts 3 and 4 (supplier-rebate scheme). And as we have already stated, the jury instructions on this matter were fully adequate. We therefore reject Hedlund's guilt-by-association argument.

The remaining issue on this appeal concerns Hedlund only. He asserts that by virtue of his testimony before the first grand jury in June 1975, he was immune from prosecution on any aspect of the River Villa operation. We have determined to treat Hedlund's allegations on this issue as an application for postconviction relief under Minn.St. c. 590. Accordingly, Hedlund should file his claim for relief with the district court in the manner required by Minn.St. 590.02.

The judgments of conviction are in all respects affirmed.

Affirmed.

WAHL, Justice (concurring specially).

I concur with the opinion of Mr. Justice Todd on first and second issues and in the result but would prefer that the court take the following stance on the third issue:

The remaining issue on this appeal concerns defendant Hedlund only. He argues that the indictment against him should have been dismissed because of a promise of immunity made to him by the state before his grand jury testimony in June 1975 and that an evidentiary hearing should have been held on this question. It is incredible to this court that such a knowledgeable, sophisticated defendant, who was represented by competent counsel from the time he testified at the first grand jury hearing, did not raise a known issue of this magnitude in a motion under Rule 10, Rules of Criminal Procedure, to be heard and determined at the omnibus hearing which was held on February 9 and 10, 1976.[1] The issue could have been fully litigated at that time. Counsel from the attorney general's office, who had allegedly made the promise, were present in court and could have been examined. Instead, defendant Hedlund chose to wait until February 25, 1976, to move for dismissal of the indictment on the ground of promised immunity and until even later to petition for an evidentiary hearing to explore the issue.

It is interesting to note that in affidavits to this court, in support of a petition for a writ of prohibition, both Hedlund and the attorney who represented him at the grand jury proceeding stated that the only immunity offered to Hedlund prior to his appearance before the grand jury was use and derivative use immunity, while on appeal it is contended that he was offered full transactional immunity. Further, in none of the affidavits presented in support of defendant Hedlund's motion or petitions has he delineated any specific evidence derived from his grand jury testimony which became the basis for his conviction.

We would have preferred that the issue be litigated and on the record for review, but under the facts and circumstances of this case we find no abuse of discretion in the trial court's denial of defendant Hedlund's motion to dismiss the indictment and his petition for a further evidentiary hearing.

Affirmed.

PETERSON, Justice (concurring specially).

I join in the opinion of Ms. Justice WAHL.

---

1. Failure to include in a Rule 10 motion all defenses, objections, issues and requests then available to the moving party constitutes a waiver thereof unless the court grants relief from the waiver for good cause shown. Rule 10.03, Rules of Criminal Procedure. The court in defendant Hedlund's case did not grant relief from the waiver, nor did the issue raised go to the jurisdiction of the court.