**STATE of Minnesota, Respondent,**

v.

**Tamara Jane MARTINSON, Appellant.**

**No. C0-87–1656.**

Court of Appeals of Minnesota.

April 12, 1988.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, Michael Q. Lynch, Kandiyohi Co. Atty., Willmar, for respondent.

Jonathan G. Steinberg, Chrastil & Steinberg, Minneapolis, for appellant.

Considered and decided by FOLEY, P.J., and NORTON and MULALLY,* JJ., with oral argument waived.

## OPINION

### EDWARD D. MULALLY, Judge.

Tamara J. Martinson appeals her convictions of first degree arson and attempted first degree murder. *See* Minn.Stat. §§ 609.561, subd. 1, 609.17, subd. 1, 609.185 (1984). Pursuant to Minn.Stat. § 609.05, subd. 1 (1984), she was found criminally liable for these two offenses which were committed by another person. She claims the evidence was insufficient to convict her and that the court erred in admitting her pre-arrest inculpatory statements to the police. She also claims the trial court should have vacated the lesser conviction of first degree arson because both crimes were part of the same behavioral incident. We affirm in part and vacate in part.

## FACTS

Appellant spent the evening of May 26–27, 1986 with her boyfriend James Flygstad and two acquaintances, Roseann Brown and Louis Durante. Durante and Brown, who were dating at the time, occasionally socialized with appellant and Flygstad. The four of them spent the evening together, with appellant driving them around and about the City of Willmar in her car.

At Durante's direction, appellant drove past the trailer home of Robert Rodriguez at least five times during the course of the evening. Rodriguez lived with his wife and three young children in a trailer park outside Willmar. Unknown to appellant at the beginning of the evening, Durante and Rodriguez had hard feelings for one another and had fought on occasion. Roseann Brown, Durante's girlfriend, had a three-year-old child by Rodriguez. Brown had physical custody of the child and opposed Rodriguez' visitation rights. As Brown's boyfriend, Durante occasionally entered into these visitation disputes against Rodriguez.

As the evening wore on, appellant began to realize the men were planning to seek some type of revenge on Rodriguez. At one point she heard them say they were going to get back at Rodriguez for punching out Durante and harassing Roseann all the time. However, the men never actually stated what they intended to do.

Durante directed appellant to make several stops during the evening. Once they stopped to let Durante get out near Rodriguez' home. When Durante returned to the car he had in his hand what appellant believed was a fuse from a fuse box. They also stopped several times by dumpsters from which the men collected two bottles and some rags. Later, they stopped behind a store named the Wicker Shop. The men took their bottles and rags and disappeared behind the store for about five minutes. After they returned to the car, appellant noticed the bottles were filled with liquid and smelled of gasoline. Appellant surmised they had siphoned gasoline out of a car behind the store.

Appellant then drove them around for about 10–15 minutes before returning again to the Wicker Shop. Without a word, the men then left the car carrying their bottles. Appellant claimed she did not know where the men went so she drove

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

around again, returning every so often to the Wicker Shop. After about 15 minutes she found the men back behind the shop.

When the two men got back into the car, Durante gold her to drive by Rodriguez' trailer. When she drove by, appellant saw a small flame by the entryway to the trailer and another one in the gravel driveway. Appellant then drove away from the trailer and stopped at a grocery store. By the time they emerged from the store, they could see fire trucks and people heading toward the fire. Appellant again drove by the trailer and this time the flames had almost consumed the trailer.

While appellant was in the grocery store, a neighbor who had risen to attend to his child noticed the trailer was on fire. He banged on the trailer door to wake the Rodriguezes who then were able to escape without harm. Their trailer and all its contents were destroyed by the fire.

The deputy state fire marshall, called as an expert witness, concluded the fire resulted from an incendiary device placed on the entryway to the trailer. He also testified that the fuses to the trailer home had been removed prior to the fire and that the tires on Rodriguez' car were slashed.

Spectators at the fire identified appellant's car as the one which Rodriguez chased. Investigator Kappers of the Willmar police questioned appellant twice during the next day and she denied knowing how the fire started. Kappers kept in contact with appellant and she eventually agreed to a taped interview at the police station on August 21, 1986.

Prior to taping, Kappers told appellant she was not under arrest, that she did not need to do this and that she was always free to go. During the middle of the interview, this interchange between Kappers and appellant occurred:

Q  Okay. Now today you've been in my opinion very cooperative. What you've told me has been consistent with the facts I already know. I'd like to get this on the tape. When I first met you today, I told you that you were not under arrest; is that correct?

A  Yeah.

Q  That I was not here to arrest you?

A  Yes.

Q  But that I wanted to talk to you about that fire?

A  Yes.

Q  And I asked you if you'd cooperate and tell the truth this time?

A  Yes.

Q  And did I threaten you?

A  No.

Q  Did I promise anything to you?

A  No.

A  So is it fair to say that you've done this voluntarily?

Q  Yes.

Q  Okay. And I've explained to you that we are treating you as a witness in this case and not as a defendant.

A  Yes.

Kappers testified that he did not yet believe appellant was a suspect in the case as of the August 21, 1986 interview.

The interview concluded with this exchange:

Q  Now I've explained to you that when this goes to trial or I should say if it goes to trial the State would subpoena you to testify?

A  Yes.

Q  You understand that's a possibility?

A  Yes, I do.

Q  And I've told you that we'll transcribe this and give you a copy of this?

A  Um-hum.

Q  You understand that's going to maybe take a couple of days or so.

A  Yes, I do.

Q  I can mail it to you. Okay. That's the end of the statement. The time is 1530 hours. Thank you.

Flygstad, appellant's boyfriend, was also interviewed at the station the same day.

On August 27, 1986, Kappers went to appellant's house to have Flygstad and her sign transcripts of their August 21 statements. While at appellant's house, he

asked if he could again tape another statement because he had previously forgotten to ask them about Durante's taking the fuse from the fuse box. Both again consented to a taped interview which Kappers then conducted. As of August 27, Kappers needed appellant and Flygstad as chief witnesses against Durante; he did not consider them suspects at that time.

Kappers subsequently received information from which he concluded appellant had lied to him in the two interviews. He also believed appellant lied to the grand jury in the indictment proceedings against Durante. Kappers contacted appellant and she agreed to a third taped interview on November 6, 1986 at the town hall in Clinton, Minnesota.

Before starting the interview he emphasized that he wanted to get the true and complete story. The interview concluded with the following interchange.

Q  I want to get back to the conversation we had before we took this statement. That was what 30 minutes approximately give or take a few?

A  Yes.

Q  Is that correct?

A  Yes.

Q  Did I tell you you were not under arrest?

A  Yes.

Q  How many times did I tell you that?

A  Quite a few.

Q  Did I tell you that you were free to leave?

A  Yes.

Q  How many times?

A  Quite a few.

Q  Did I tell you you didn't have to talk to me?

A  Yes,

Q  Did I promise you anything?

A  No.

Q  Did I make it sound like I was promising you anything?

A  No.

Q  Is there anything I said that made you think that if you talked to me you wouldn't be in trouble or somebody wouldn't be or it would be better or anything like that?

A  No.

Q  And did I threaten you at all?

A  No.

Q  Is this totally what you wanted to do?

A  Yes.

Q  Did I leave it up to you totally?

A  Yes.

Q  Is there anything else that I told you before we did this taped statement?

A  About what?

Q  Well, that we talked about. Anything that—okay. I told you that we had more evidence.

A  Yes.

Q  That specifically we had evidence to show that not only Louie (Durante) went there when the fire was set but Jim (Flygstad) also; correct?

A  Yes.

Q  And I told you that Roseann had talked to me.

A  Yes.

Q  And I told you that I had an indication from Louie Durante's defense attorney that he may talk to me the next couple of days.

A  Yes.

Q  And besides that did that cover everything we talked about?

A  Yes.

Q  My main concern is here the real circumstances of you giving this statement come out. And by that I mean, you know, how—whatever your attitude and how did you feel and so on and I guess basically did I really leave it up to you?

A  Yes, I did.

Q  And I told you I'd leave and that was fine, too; right?

A  Yes.

Q  But I did lay out the facts for you and based on that you made a decision I take it?

A  Yes.

**Q** Is there anything else?

**A** Not that I can recall. I've pretty well covered everything that happened that night.

The state based its case primarily on three taped interviews in which appellant related the details of her involvement the evening of the fire. The full contents of the interviews were read into the record over appellant's objections. She claimed she should have been given *Miranda* warnings prior to the interviews or, alternatively, that Kappers had deceived her and her statements were thus involuntary.

The jury returned guilty verdicts on both counts charged. The trial court entered convictions on both verdicts and sentenced her to 35 months in prison, half the presumptive sentence for attempted first degree murder.

## ISSUES

1. Was the evidence sufficient to support convictions of first degree arson and attempted first degree murder?

2. Did the trial court err in admitting appellant's taped statements to the police?

3. Should appellant's first degree arson conviction be vacated because it was an offense arising out of the same behavioral incident as the attempted first degree murder?

## ANALYSIS

1. Appellant does not claim the evidence was insufficient to establish Flygstad and Durante committed the crimes. She argues only that the evidence is insufficient to establish she is criminally liable for their crimes.

"A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1. A person is also liable for all resulting crimes reasonably foreseeable from committing the intended crime. *Id.*, subd. 2. A person need not be actively involved to be held criminally liable. *State v. Strimling*, 265 N.W.2d 423, 429 (Minn.

1978). It is sufficient that "the accused plays at least some knowing role in the commission of the crime and takes no steps to thwart its completion." *Id.*

▇ Appellant claims the evidence does not establish beyond a reasonable doubt that she aided arson *of a dwelling* and attempted *premeditated* murder. Specifically, she argues the evidence does not show that she knew the men would burn a dwelling nor that she knew they planned to kill Rodriguez.

The evidence reveals the following facts which show appellant *did* know what crimes were to take place: she was directed to drive by Rodriguez's trailer on many occasions; she knew Durante sought revenge against Rodriguez; she saw the fuse in Durante's hand when he returned from Rodriguez's trailer; she knew people were inside the trailer; she knew Durante had slashed Rodriguez's tires; and she knew the men had constructed and were carrying Molotov cocktails in the car. In her defense, she essentially claims ignorance— that she was only driving and could not have known exactly what the men planned to do.

In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

*State v. Turnipseed*, 297 N.W.2d 308, 313 (Minn.1980) (quoting *State v. Merrill* 274 N.W.2d 99, 111 (Minn.1978) (citations omitted). In this case, there is sufficient evidence from which a jury could have reason-

ably found appellant guilty beyond a reasonable doubt.

Relying on *State v. Berndt*, 392 N.W.2d 876, 881 (Minn.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 909, 93 L.Ed.2d 859 (1987), appellant claims her conviction cannot stand because it was based on circumstantial evidence which could support a rational hypothesis of innocence. Appellant's argument fails because, unlike in *Berndt* where a conviction was based entirely on circumstantial evidence, her statements to police constituted substantial direct evidence of her involvement in the crime.

2. Appellant argues her statements made to police are inadmissible for two reasons. First, she claims she was in custody and that the police should have read her Miranda rights before questioning her. Alternatively, she claims her statements were obtained by coercion or deceit and were thus involuntary.

a. A person must be given a Miranda warning when subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). A person is in custody when "deprived of his freedom of action in any significant way." *Id.* One is not in custody simply because the police think he or she is a suspect and choose to interview him or her. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). As all police interviews have a coercive aspect to them, there must be some further restriction on one's freedom to render the person "in custody." *Id.* The trial court will not be reversed in its determination of a defendant's custodial status unless it clearly erred in determining the defendant did not reasonably believe her freedom of action was restricted in any significant way while she was being questioned. *See State v. Palm*, 299 N.W.2d 740, 742 (Minn.1980).

■ After reviewing the interviews between investigator Kappers and appellant, we conclude the trial court did not clearly err in finding appellant's freedom was not restricted in a significant way. The tape recordings indicate she felt she was free to go at any time during the interviews. As appellant provided no testimony at the omnibus hearing to rebut the tape recordings, we must conclude the tapes reflect her true feelings of whether she was "in custody."

Appellant relies on *State v. Stai*, 381 N.W.2d 60 (Minn.Ct.App.1986) in arguing a Miranda warning must be given when the police have "reasonable grounds to believe both that a crime has been committed and that the defendant is the culprit." *Id.* at 63 (quoting *State v. Kinn*, 288 Minn. 31, 35, 178 N.W.2d 888, 891 (1970)). However, the language from *Kinn* upon which this court in *Stai* relied was expressly overruled by the supreme court in *State v. Herem*, 384 N.W.2d 880, 884 n. 2 (Minn.1986). The *Herem* court made it clear that the Miranda warning is not required when a person is merely the focus of suspicion and not in custody. *See id.*

■ b. The standard for determining whether a defendant's statement is involuntary is set forth in *State v. Gard*, 358 N.W.2d 463, 467 (Minn.Ct.App.1984).

The due process clause of the fourteenth amendment requires that confessions be admitted only if they are made voluntarily. To determine the voluntariness of a confession, the court must examine the totality of the circumstances. One test is 'whether the defendant's will was overborne at the time he confessed.' 'In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.'

*Id.* (citations omitted). Among the factors bearing on voluntariness are

(1) the age, maturity, intelligence, education and experience of the defendant and the ability of the defendant to comprehend; (2) the lack of or adequacy of warnings; (3) the length and legality of the detention; (4) the nature of the interrogation; (5) whether the defendant was deprived of any physical needs; and (6) whether the defendant was denied access to friends.

*Id.* (citing *State v. Linder*, 268 N.W.2d 734, 735–36 (Minn.1978)).

Considering these six factors, it does not seem appellant's will was overborne at any

time prior to or during the interviews. Nor was there sufficient evidence appellant was coerced or misled into an involuntary confession.

Appellant seemed fully aware that her cooperation was voluntary and that she was free to go at any time during the interviews. All interviews were of relatively short duration and she was never deprived of any physical needs. In addition, she was with her boyfriend, later to become her fiance, during two of the three interviews, and the third interview was conducted in the non-coercive atmosphere of a public hall. Therefore, admission of her statements at trial was not a denial of due process.

■ 3. "[I]f a person's conduct constitutes more than one offense under the laws of this state, he may be punished for only one of the offenses and a conviction or acquittal of any of them is a bar to prosecution for any other of them." Minn.Stat. § 609.035 (1986). The state concedes appellant can be punished for only one of the crimes charged because her actions constituted a unitary course of conduct. *See State v. Gilbert*, 262 N.W.2d 334, 338 (Minn.1977). Therefore, the state agrees appellant's conviction of first degree arson must be vacated.

## DECISION

Appellant's conviction of attempted first degree murder is affirmed and her conviction of first degree arson is vacated.

Affirmed in part and vacated in part.