STATE of Minnesota, Respondent,

v.

William E. LONE, Appellant.

No. C5–83–915.

Supreme Court of Minnesota.

Feb. 8, 1985.

---

Paul Engh, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Charles I. Wikelius, Sp. Asst. Atty. Gen., St. Paul, for respondent.

SCOTT, Justice.

This appeal arises from William E. Lone's conviction of four counts of theft by swindle pursuant to Minn.Stat. § 609.52, subs. 2(4), 3(1), and 3(5), and § 609.05 (1984). Lone alleges that the trial court's jury instructions on theft by swindle were prejudicially in error because they did not allow the jury to consider whether appellant gave something of value as return for homeowners' payments, in determining whether appellant was guilty of theft by swindle. Appellant further asserts that the trial court abused its discretion in departing from the presumptive sentence by executing a prison term of 21 months for appellant. We affirm the trial court.

Following an "investigative news" report broadcast by a local television station and subsequent complaints from affected homeowners, the State of Minnesota instigated a criminal investigation of Central States Waterproofing, Inc. (CSW) and its president, William E. Lone. The state then charged Central States Waterproofing, Inc.; National Management Consultants, Inc. (NMC), an Iowa corporation which handled profits of CSW; William Lone, president of CSW and sole shareholder of NMC; and Thomas J. Horner, vice president of CSW and manager of the Minneapolis branch of CSW, with certain criminal violations. The complaints arose out of CSW's operation in Minnesota.

Lone began CSW in 1976 in Des Moines, Iowa, after leaving a management position with another waterproofing company. The Minnesota branch was the fourth or fifth of what eventually became a nine-state operation. The Minnesota CSW was a separate corporation owned principally by Lone. Lone had a doctorate in political pastoral counseling through a correspondence course from Florida State Christian College, a now defunct organization, and referred to himself as "Dr. Bill Lone."

The corporation's installation in Fridley, Minnesota, consisted of a phone bank room, a salesroom, and a production department. On the average, seven or eight phone solicitors and a phone room manager operated the phone sales twelve hours a day. Lone also advertised heavily on local television. CSW selected prospective names from Cole's Directory, a directory listing addresses first, then phone numbers. The calls went out either randomly or, as calls came in from one area, more calls would be directed to that area. The phone solicitors were given a CSW sales manual which included different sales pitches and also a script of patterned responses to often-asked questions. Horner told John Anderson, an assistant phone room manager, that the scripts and the sales books were designed by a psychologist. The basic features of the script emphasized by the state at trial were: (1) that the homeowner was assured that the inspector sent out by the company was an expert in the field of

waterproofing homes and (2) that he was paid strictly per inspection. It is undisputed that the inspectors were simply salesmen who were paid on a commission basis and followed CSW's instructions.[1]

If the homeowners did not buy on the first contact, they were called back and another inspection, by the "chief inspector," was offered, although there was no individual by that title. The homeowners were told that CSW would do only what was necessary to repair the basement, although salesmen were instructed to sell the whole basement package once they arrived at the home.

The sales force was trained by repeatedly watching a video tape of Lone instructing the sales force on the techniques of selling, by watching other sales pitches, and by reading CSW training material. The tape consisted of a ten-step routine which the sales force was instructed to follow in every presentation. The philosophy of CSW was that everybody needed the waterproofing system, so the salesmen were to sell the whole basement package and not to make individual determinations of necessity for repairs. A discount of 10 percent was offered only after the price had been increased 10 percent. Various other discounts were offered, based upon the reluctance of the homeowner to sign the contract. Once at the home, the salesman's emphasis was to be on structural damage to the basement. The presentation included a diagram drawing of the home, with cracks and holes added to the drawing in red.

The system itself was a "dual" system, with both interior and exterior components. On the inside, the basement floor was broken around the edges, and a tiled trench was laid beneath the floor along the exterior wall. The interior tile (a perforated plastic tube approximately 5 inches in diameter) was supposed to drain to a low corner of the basement where it would collect in a sunken pail. In the pail was an electric "sump pump," designed to pump the water from beneath the basement floor. This was the "interior drain tile system." As opposed to the exterior system, the workers felt that the interior system, when properly installed, would alleviate most basement water problems.

On the outside of the home, exterior cracks were patched, a trench was dug around the house, and another drain tile was laid in the trench. The exterior tile was supposed to drain away from the foundation into a "dry well" or a sunken pail or drum. A mixture called CS–10 was diluted with water and poured into the trench. CSW's claim was that it would seep along the exterior walls of the house all the way to the base. A single application was done, even though the homeowners were told there was a double application. Testimony was introduced at trial by both sides as to the utility of CS–10, with most of it concluding that CS–10 was useless. Even the appellant's experts agreed that in the dilution that CSW applied the CS–10, it could not seal the foundation. With the exception of the patching of cracks, experts testified, the exterior system could exacerbate any water problem.

By the summer of 1981, CSW was making well over 100 service calls per month on homes with continuing water problems. In the nine-month period from February 1, 1981, to October 31, 1981, there were 848 service calls—approximately one for each system that had been installed.

The defendants were charged with four counts of theft by swindle pursuant to Minn.Stat. § 609.52, subds. 2(4), 3(1) and 3(5), and § 609.05 (1984). Each count covered a six-month period from February 1980 through October 1981, during which the alleged swindles occurred. The jury returned guilty verdicts on all four counts against Lone, Horner, CSW, and NMC.

---

1. The telephone solicitation emphasized throughout that a "real expert" would inspect the home. Further, if the homeowner should mention that his basement only leaked in one small area, part of the standard response was,

"I'm sure you realize that your house which weighs over *30 tons* rests on that small crack, and good advice can prevent it from getting bigger." (Emphasis in original.)

Lone and Horner each moved for acquittal. The trial court granted Horner's motion and denied Lone's. The court then granted the State's motion to depart from the presumptive sentence under the Minnesota Sentencing Guidelines. Lone was sentenced as follows: Count I, 15 months, Count II, 15 months, Count III, 18 months, Count IV, 21 months, with the sentences to run concurrently. The court departed from the guidelines, which recommend a stayed sentence, and executed the sentence. CSW and NMC were found guilty and fined $1,001 on each count. Both corporations are now defunct.

The following issues are presented:

(1) Was the jury properly instructed that in determining whether appellant was guilty of theft by swindle it was no defense that the victims received something of value for their money?

(2) Did the trial court properly depart upward from the presumptive sentence under the Minnesota Sentencing Guidelines by executing a prison term of 21 months?

■ 1. The appellant argues that in determining whether he committed theft by swindle the jury should have been able to consider whether the homeowners received something of value in return for their money. The trial court's rejection of this theory and its adoption of a contrary theory, it is argued, was an error of law. The following instructions were given at trial:

The specific crime with which these defendants are charged is theft, or stealing. The specific means they are charged with using is a swindle.

The essence of a swindle is cheating another person by a deliberate artifice or scheme.

A person commits theft by swindle if he, acting alone or through others, intentionally causes a false representation or representations to be made to a victim in order to obtain that victim's money, provided:

—The person knows or believes the representation to be false;

—The representation is material;

—The person intends the victim to believe the representation;

—The victim believes the representation and acts accordingly.

A false representation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether or not to buy.

Now a swindle is a deliberate artifice or scheme. One cannot commit a swindle by accident or by negligence, or mere puffing. The law allows a merchant a certain latitude in extolling his product, and even in exaggerating the customer's need for it. This is called puffing, and if you find a defendant made some false representations but that they amounted to mere opinion, or puffing, then these false representations alone will not support a conviction.

Similarly one cannot commit a swindle if he honestly believes that what he is saying is true. If you find a defendant reasonably and honestly believed the statement to be true, then he cannot be convicted on the basis of that statement, even if it is false.

The crime of theft by swindle is committed when the victim parts with his or her money. If a theft by swindle has been proved, it is no defense that the victim received something of value for the money.

In lieu of the final underscored paragraph, the appellant requested the following language, which was rejected by the trial court:

The defendants have been charged with theft by swindle. Before you can convict them of the charge, you must first find that they intended to commit a theft. Theft is taking money from a person without giving value in return. If you find that the defendants did take money from the victims, but they did so in the good faith belief that they were giving something in return, then you must acquit.

The four false representations alleged in this case were, first, that the salesmen

were trained experts, when in fact they were merely salesmen. Second, that the lowest possible price for a CSW system was available at the first inspection, when subsequent discounts were offered if the first sale was not made. Third, that the customers were told the presence of basement moisture meant the home had serious structural damage, requiring immediate arrest. The homeowners were informed that their homes were surrounded by clay, which retained water exerting pressure on the foundation. Further, they were told that moisture entering the basement through walls washed away lime in the concrete, which was the "glue" holding the concrete together, and that water entering a home from beneath the floor, evidenced by cracks in the floor, would eventually break up the floor. The homeowners were told "the walls and the floor have cancer," and that the walls were not "going to come down tomorrow," "because only God knows just how much it is going to rain and how much your wall is going to deteriorate." Expert testimony revealed that water in the basement may in some circumstances, combined with other factors, cause structural damage to a home, but in the overwhelming majority of situations it does no harm. The final claim made by CSW that is alleged to be a misrepresentation was that the CSW "dual system" would arrest structural damage by sealing exterior walls with CS–10. The evidence soundly established that CS–10 was not only useless in protecting against structural damage, but that in the dilutions and methods used by CSW it had no value as a waterproofing agent.

A fine line exists between what is puffing and what is actually a swindle. The ultimate answer is one for the jury. In this case, the jury was well-instructed on how it could distinguish these two amorphous concepts. The court instructed the jury that the law allows a merchant certain latitude in extolling his product and even allows him to exaggerate the customer's need for the product, but that the merchant cannot make false representations. This court recognized in *State v. Ruffin*, 280 Minn.

126, 158 N.W.2d 202 (1968), that "swindle" defies precise definition in that no single definition can cover the range of possibilities for the offense. In attempting to reach a resolution, this court said: "It seems to us that it may be fairly said that the statute punishes any fraudulent scheme, trick, or device whereby the wrongdoer deprives the victim of his money by deceit or betrayal of confidence." *Id.* at 130, 158 N.W.2d at 205. In *State v. Hodge*, 266 Minn. 193, 123 N.W.2d 323 (1963), this court said that where a victim's confidence is fraudulently procured by a method which normally dispels suspicion or caution, the requirements of the statute have been satisfied.

A review of the testimony in the instant case indicates that there were two flagrant misrepresentations: that the presence of water in the home was evidence of structural damage; and that CS–10 was a useful waterproofing and sealing agent. The primary issue in this case is whether a defendant charged with theft by swindle should be able to have the jury consider that he may have given the victims something of value.

The offense of theft by swindle is defined as:

> Whoever does any of the following commits theft and may be sentenced as provided in subdivision 3:
>
> *   *   *   *   *   *
>
> (4) By swindling, whether by artifice, trick, device or any other means, obtains property or services from another person;

Minn.Stat. § 609.52, subd. 2(4) (1982). The respondent argues that "obtains property" means necessarily that once the property is obtained by swindle the crime has been committed regardless of any subsequent value given. The appellant argues that because the homeowners were given a waterproofing system, the jury should have been able to consider its value, even if nominal. A few Minnesota cases have touched on theft by swindle, although none

have specifically addressed the question now before the court.

The major case discussing repair swindles is *State v. Wells*, 265 Minn. 212, 121 N.W.2d 68 (1963). In that case the defendant held himself out as a contractor engaged in the business of repairing homes. He was hired by a 59-year-old woman to repair her chimney. Defendant was charged with fraud because he had told the woman her chimney was deteriorating and that gas was leaking from it, when in fact he had artificially made it appear as if gas was leaking from it. Nevertheless, repairs were in fact made to the chimney by tuckpointing around it and by applying a cement-base paint to seal and waterproof the chimney. Despite the fact that something of value was done to the chimney, defendant was charged with, and convicted of, theft by swindle. *Id.* at 214, 121 N.W.2d at 69.

Appellant attempts to distinguish his case from *Wells*. He argues that unlike the situation where defendant tricked the woman into believing she had a gas leakage problem, here the homeowners did have water problems which Lone attempted to correct. This argument ignores the fact that what defendants emphasized in their sales presentation was not the water problem, but that the presence of water in the basement was evidence of more serious structural damage to the home.[2]

The evidence introduced at trial overwhelmingly supported the fact that the presence of water in the basement was not evidence of structural damage. One expert testified that it was natural to have cracks in the basement which would be evidence of settling of the home. Therefore, the instant case is very closely on point with the *Wells* fact situation. The court in *Wells* also said that "the fact that the transaction has the semblance of a legitimate business contract may obscure its true nature, but not prevent it from constituting a swindle." *Id.* at 214, 121 N.W.2d at 69. (citation omitted).

Other jurisdictions have held similarly. In *Paulk v. State*, 344 So.2d 304 (Fla.Dist. Ct.App.1977), the defendant posed as a pest exterminator. He represented to an 83-year-old woman that she had termites in her basement, when in fact he had placed them in her home. The defendant tricked the woman into believing that she had a termite problem, misrepresented the potential consequences of failing to treat the problem, and misrepresented the reason for the price reduction which was offered. *Id.* at 305. The court found that the actual treatment given by the defendant, a preventive treatment for drywood termites, was a bona fide treatment, and that the price charged was fair. The court concluded, however, that the providing of this treatment could not insulate the defendant from criminal prosecution. *Id.* at 306. The crime of larceny by trick did not turn on whether or not there was value received by the victim. The court said there was no requirement that the victim suffer any pecuniary loss whatsoever. Once the victim had parted with her money in reliance on false representations, it was immaterial whether whatever she got in return was equal in value to that which she surren-

---

2. For example, in the sales training tape the salesmen were instructed to say:

> In other words Mr. and Mrs. Jones, this is not a water problem, but a structural problem. If you only have a water problem, I would say, have somebody mop it up, or spend little money to worry on about it because it's just more or less a nuisance. But the water is a symptom, not a problem. If this home, *if these walls were 100 percent structurally sound, you would not be getting water into your basement.* You have to have cracks and crevices and so forth for you to have water coming in. Now the reason that I am concerned about the water is because it's a symptom.

Later in the sales tape, the appellant instructed his salesmen:

> The point here, Mr. and Mrs. Jones is that the problem you have is a structural problem. Your walls are no longer 100 percent structurally sound, your floor is no longer 100 percent structurally sound and they just have to be repaired. No matter who repairs them, whether it's somebody else or Central States or what, the main thing I want you to understand is that *your problem is not a water problem, it's a structural problem* and the two problems that you really have, both of which are structural. One is capillary action and the other is hydrostatic pressure.

(Emphasis added.)

dered. *Id.* at 305. As Judge Learned Hand stated in *United States v. Rowe*, 56 F.2d 747 (2d Cir.1932):

> A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.

*Id.* at 749.

The appellant here, in essence, argues that the jury should perform some type of balancing test; that they consider what the victims gave up in relation to what it was they received, and if what they gave up was greater than what they received, a theft by swindle has taken place. This does not seem to fit the statutory definition of theft by swindle, whoever "[b]y swindling, whether by artifice, trick, device, or any other means, *obtains property* or services from another person." (Emphasis supplied.) *See* Minn.Stat. § 609.52, subd. 2(4) (1984).

In theft by swindle, value becomes irrelevant. In this case all of the victims were cheated, even though some may have a functioning water removal system. They were cheated because through CSW's misrepresentation of the danger of structural damage, the victims lost their chance to bargain on the basis of the true condition of their homes.

■ 2. Lone was convicted of four counts of theft by swindle of an amount over $2,500, an offense having a severity level of IV under the Sentencing Guidelines. Using the *Hernandez* method of computing appellant's criminal history score, appellant's presumptive sentence would have been a stayed sentence of 21 months. *See State v. Hernandez*, 311 N.W.2d 478 (Minn.1981). However, the trial court departed dispositionally from the presumptive sentence, executing instead of staying the sentence, and ordering appellant to be imprisoned for 21 months. The court's decision to depart from the guidelines was based on its finding that appellant's offense was a "major economic offense," [3] an aggravating factor which justifies an upward dispositional departure pursuant to Minnesota Sentencing Guidelines II.D.2.b.(4).

The court chose to execute the sentence rather than stay it, reasoning that there existed a multiplicity of victims, that the scheme was sophisticated and occurred over a long period of time, and that it involved a monetary loss in excess of the amount specified in the statute.

Very few cases in Minnesota have interpreted a major economic offense departure from the guidelines. *See State v. Frost*, 306 N.W.2d 803 (Minn.1981); *State v. Rott*, 313 N.W.2d 574 (Minn.1982).

In *State v. Brigger*, 316 N.W.2d 512, 513 (Minn.1982), the defendant entered a straight guilty plea to aggravated forgery based on a check for $450. Looking at defendant's compulsive check-forging history, the court upheld a durational departure since there were multiple victims or multiple incidents per victim and the amount obtained in the underlying course of conduct was substantially greater than the

---

**3.** Major economic offenses are defined by the guidelines as:

> [A]n illegal act or series of illegal acts committed by other than physical means and by concealment or guile to obtain money or property, to avoid payment or loss of money or property, or to obtain business or professional advantage. The presence of two or more of the circumstances listed below are aggravating factors with respect to the offense: (a) the offense involved multiple victims or multiple incidents per victim; (b) the offense involved an attempted or actual monetary loss substantially greater than the usual offense or substantially greater than the minimum loss specified in the statutes; (c) the offense involved a high degree of sophistication or planning or occurred over a lengthy period of time; (d) the defendant used his or her position or status to facilitate the commission of the offense, including positions of trust, confidence, or fiduciary relationships; or (e) the defendant has been involved in other conduct similar to the current offense as evidenced by the findings of civil or administrative law proceedings or the imposition of professional sanctions.

Minnesota Sentencing Guidelines, II.D.2.b.(4).

minimum required for defendant's conviction. *Id.*

In the instant case the trial court based its dispositional departure from the guidelines on three factors: a multiplicity of victims; an attempted or actual monetary loss substantially greater than the minimum loss specified in the statutes; and a high degree of sophistication or planning occurring over a lengthy period of time.

The CSW system was sold to approximately 907 households. The evidence indicated that almost all of the sales were preceded by a pitch replete with misrepresentations. Of the 907 sales, 200 complaints were made to the Minnesota Attorney General. The majority of those complaints came after the investigative news report. Out of those, nine CSW customers from Ramsey County testified at trial.

Despite appellant's argument that these people are not victims, the homeowners did not get what was represented to them, which was a system that would arrest structural damage in their homes. Even if some customers were satisfied with their waterproofing systems it does not eliminate the significant number who were unhappy with what they were given, nor does it preclude that great number who did not get what they paid for because of Lone's misrepresentations.

Secondly, the offense involved an attempted or actual monetary loss substantially greater than the minimum loss specified by the statute. *See* Minn.Stat. § 609.-52, subds. 3(1) and 3(5) (1982). One expert testified that the majority of basement problems could be solved for less than $100. The average cost of the CSW installation was $3,500. Regardless of whether the appellant's system succeeded at removing water from the victim's home, it could not have arrested structural damage, and it was the structural damage which the appellant emphasized. The aggregate loss in this case was greater than the $2,500 statutory minimum, and sufficient to justify the departure for a major economic offense. *See State v. Brigger*, 316 N.W.2d 512 (Minn.1982); *State v. Rott*, 313 N.W.2d 574 (Minn.1981).

Lastly, the Minnesota CSW operation continued for a period of two and one-half years, from its inception in May 1979 to its abandonment in November 1981. The appellant argues that this was not a highly complex, sophisticated swindle, but rather a company that used aggressive sales techniques "commonly accepted in the direct sales industry." The CSW scheme was in fact specifically designed to make people believe they had serious structural damage to their homes when in fact they had none. Secondly, they were led to believe that the application of CS–10 had some usefulness. These representations started with the first phone contact and lasted until the homeowner finally bought the system. The scheme was sophisticated and complex, and two and one-half years is clearly a "lengthy" period of time.

This case clearly concerns a major economic offense.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.