**STATE of Minnesota, Respondent,**

v.

**Daniel W. SAYBOLT, Appellant.**

No. C5-89-2242.

Court of Appeals of Minnesota.

Oct. 30, 1990.

Review Denied Dec. 17, 1990.

**730**

John W. Lundquist, Thompson & Lundquist, Ltd., Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas Johnson, Hennepin Co. Atty., Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

Considered and decided by NORTON, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

RANDALL, Judge.

Following a jury trial, appellant Daniel W. Saybolt was found guilty of attempted theft by swindle of over $35,000 in violation of Minn.Stat. §§ 609.52, subd. 2(4) (Supp. 1987), 609.52, subd. 3(1) (Supp.1987) and

609.17 (1986). He appeals from the judgment of conviction. We affirm.

## FACTS

At the time of the alleged offense, appellant was an assistant vice president of Cargill Metals with responsibility for the buying and selling of zinc concentrate on a world-wide basis. He had worked for Cargill since 1974. Sometime during late September or early October 1987, Cargill decided to end its zinc concentrate trading because it had consistently lost money in such trading over the previous six years. Appellant was aware of the imminent closing of his section and had already begun to look for other employment.

Early in October, appellant's supervisor instructed him to expeditiously liquidate Cargill's remaining zinc concentrate positions. He was to do this while keeping as low a profile as possible. Knowledge that Cargill was trying to get out of the market would have a negative influence on the terms of any sales contracts it might obtain.

In the middle of October, appellant attended a zinc concentrate conference in Vienna where leading traders discussed their projections of the market for zinc concentrate for approximately the next six months.

On October 24, after returning from the Vienna conference, appellant was instructed by his supervisor to liquidate, by October 26, 1987, the final significant position held by Cargill (20,000 tons of concentrate produced by the Torguui zinc mine in Chile).

At that time, appellant began negotiations to buy a shell corporation from Select Corporation Services, a London company specializing in putting together offshore companies. On October 28, appellant purchased Balmer Trading Limited (Balmer) for $2000. Balmer was incorporated on the Isle of Man. It was a limited company which, under the laws of the Isle, shielded the individual shareholders of the company from personal liability for the debts of the company. The laws of the Isle also provided that the names of the shareholders could be held in confidence.

Appellant did not use his own name as a shareholder in the corporation. Rather, he used the name Daniel W. McCullough. He told Select Corporation Services that he, Daniel Saybolt, was merely acting as an intermediary in setting up the company. He asked for the strictest confidentiality regarding his involvement in the company.

On October 27, one day prior to the purchase of Balmer, appellant drafted a contract for the sale of the Torquui zinc concentrate by Cargill to Balmer. He did not circulate it among the other Cargill zinc traders for comment. The credit manager, unfamiliar with Balmer, felt that she could not approve the contract without the concurrence of her supervisor. The supervisor, also unfamiliar with Balmer, consulted with appellant as to the identity of the buyer. Appellant assured the supervisor that Balmer was affiliated with Marc Rich of Zurich, Switzerland, a large, well-known trading business. He indicated that he was dealing with a David Cohen. No David Cohen existed. Since the supervisor had no personal knowledge of Balmer, he left it up to appellant to approve the credit. Appellant then gave credit approval and returned the contract to the supervisor, who gave it to a secretary to send to Balmer.

The significant terms of the Balmer contract were; Cargill would sell 20,000 tons of zinc concentrate from the Torquui mine to Balmer for a base price of $820 per ton, C.I.F. under tackle to a European smelter port or parity; there was a treatment charge of $165.50 per ton with an iron penalty clause of approximately $9–$10 per ton, based on the assayed iron content of 11.18; payment was to be within 30 days of the vessel's arrival at its port and against presentation of the seller's documents; finally, the treatment charge and the iron penalty clause are deductions from the base price. The higher the treatment charge and iron penalty clause, the less favorable the contract is to the seller, in this case, Cargill.

At the same time appellant was preparing the Balmer contract, he, as Balmer,

sent out seven or eight solicitations to sell the Torquui concentrate to smelters throughout Europe. These solicitations were the basis of $820 per ton but with a treatment charge of $162.50 per ton, and with no iron penalty clause. If appellant had been able to resell the zinc concentrate on these terms, he would have made a profit of approximately $260,000 on the sale. He received no response to his solicitations.

On October 28, the day following the preparation of the Balmer contract, appellant's employment with Cargill was terminated. Because Balmer Trading Limited was not familiar to anyone at Cargill, inquiries were made which fueled suspicions about Balmer as a bona fide trader. Cargill cancelled the Balmer contract on November 20, 1987 when it determined that Balmer was not a Marc Rich affiliate. On November 5, while its officers were still trying to determine who Balmer was, Cargill began an investigation to identify the principals of Balmer. In conjunction with that investigation, a Cargill security officer interviewed appellant three times.

In the first interview on November 13, 1987, appellant detailed his dealings with Balmer through "David Cohen" and repeated his belief that Balmer was affiliated with Marc Rich. Appellant was interviewed again on December 2. During this interview appellant admitted that it was he, under the name of Daniel McCullough, who had purchased Balmer. He reiterated, however, that all the terms in the Balmer contract were at the instructions of "David Cohen" of Marc Rich. At the third meeting with the security officer on December 8, appellant again indicated that he was the principal behind Balmer. This time, however, while not specifically acknowledging that "David Cohen" did not exist, he also took responsibility for the terms of the contract.

On May 11, 1988, Cargill contacted the Minnetonka Police Department with the information it had gathered concerning the Balmer contract. Cargill alleged that appellant had attempted to swindle them in order to guarantee himself a profit of ap-proximately $562,000 on the resale of the zinc concentrate. On June 27, a complaint was issued alleging attempted theft by swindle of over $35,000. Appellant was arrested on June 29. An amended complaint was filed on August 31, 1989, and it alleged the same offense but differed in some details of the swindle.

A jury trial was held September 13–27, 1989. Inadvertently, the jury was not sworn in at the start of the trial, but it was sworn just prior to closing arguments. Neither appellant nor respondent made a motion for a mistrial or offered any objection on the record to the late swearing in. Appellant was found guilty as charged by the jury.

On October 4, appellant filed a motion for a judgment of acquittal or a new trial on the grounds that the evidence produced at the trial was insufficient to sustain the verdict. Specifically, appellant argued that the evidence was insufficient to establish beyond a reasonable doubt that he had attempted to steal property with a value in excess of $35,000. Alternatively, appellant requested that the court set aside the verdict and grant a new trial on the following grounds:

1. The jury should have been instructed pursuant to appellant's proposed instructions regarding the definition to "property", criminal intent and on the theory of the defense;

2. The jury was not sworn at the beginning of the trial; and

3. The state's evidence at trial materially and prejudicially varied from the allegations set forth in the complaint.

The motion was denied on October 27, 1989.

Appellant was sentenced and judgment entered on November 17, 1989. On December 20, 1989, he filed a notice of appeal from the judgment.

## ISSUES

1. Was the evidence sufficient for the jury to convict appellant of attempted theft by swindle of over $35,000?

2. Did the trial court abuse its discretion by refusing to give appellant's proposed jury instructions on intent, the theory of the defense and the meaning of the term "property"?

3. Did the fact that the jury was unsworn until after the completion of testimony entitle appellant to a new trial?

4. Did the evidence introduced by the state vary fatally from the allegations in the complaint?

## ANALYSIS

### I.

*Sufficiency of the Evidence*

Appellant was charged with attempted theft by swindle of over $35,000. The definition of theft by swindle is found at Minn. Stat. § 609.52, subd. 2(4):

Whoever does any of the following commits theft * * *:

by swindling, whether by artifice, trick, device, or any other means, obtains property or services from another person.

Attempt is defined as:

Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime, * * *.

Minn.Stat. § 609.17, subd. 1.

The state is required to prove every element of the charge beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970); *State v. Jones*, 347 N.W.2d 796, 800 (Minn. 1984)

The standard of review on a claim for insufficient evidence in a criminal case is found in *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988).

We must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude the defendant was guilty of the offense charged. * * * We must view the evidence in the light most favorable to the prosecution and assume the jury believed the state's witnesses and disbelieved any contrary evidence.

Two of the elements of the swindle are at issue here. The first is what property appellant was attempting to take and its value. The second is whether appellant's actions were intended to swindle Cargill or were instead a good faith effort, albeit in a manner fraught with conflict of interest, to get Cargill a fair price for its zinc concentrate.

■ During the trial, there was a serious dispute as to what it was appellant was attempting to steal. The state contends that by writing a contract that was against his employer's interests but in favor of a company in which he was the principal, appellant was attempting to swindle Cargill out of a reasonable contract price and thus guaranteeing appellant (as Balmer) a profit. This profit belonged to Cargill, and the state contended it was the property in question.

Appellant argues that the price he proposed in the contract (the price to Cargill) was fair, reasonable, at existing market value, and made in good faith. He denies that the sale would "guarantee" Balmer Trading, and the defendant, a profit of approximately $562,000 as charged in the complaint. He contends that since the terms of the contract were at market value, he was at risk as to the resale of the zinc concentrate. He argues, he could just as easily have lost money on the deal as made a profit. He argues, in effect, no property was taken and therefore his conviction should not stand.

A great deal of evidence was offered during trial as to the overall fairness of the contract, its individual terms, and the amount of potential profits from the sale. There was little agreement among witnesses.

The state's expert witness, another trader, offered his opinion that the terms of the contract, particularly as to treatment charges and the iron penalty clause, were unfair. He offered comprehensive comparisons with other zinc concentrate contracts and a detailed look at how he "priced"

terms of a contract. He indicated a potential profit to Balmer of around $300,000.

In contrast, appellant offered expert testimony that the contract was fair and at market value. At least one of his witnesses testified the terms were reasonable given the decidedly bearish market in late 1987. He testified extensively that the terms were at least similar, if not identical, to contracts being entered into by Cargill and other traders during the time period in question.

Appellant's argument is this: Since the prospect of profit to him was pure speculation, no value can be determined; property by definition must have value; since there is no value, there is no property; and therefore, since there is no property, there is no crime which could occur. This argument merits scrutiny.

We note that under Minn.Stat. § 609.17, subd. 2, impossibility of success is no defense to an attempt.

An act may be an attempt notwithstanding the circumstances under which it was performed or the means employed to commit the crime intended or the act itself were such that the commission of the crime was not possible, unless such impossibility would have been clearly evident to a person of normal understanding.

We get guidance as to the issue of value in a swindle case from *State v. Lone*, 361 N.W.2d 854 (Minn.1985). In *Lone*, the president of a waterproofing company was convicted of theft by swindle. He had made false representations in obtaining waterproofing contracts from homeowners. He claimed the homeowners had gotten something of value, although something they really didn't need.

The *Lone* court held that the jury should not have to perform balancing tests to determine the ultimate value of what has been given in relation to what was to be received in order to determine whether a swindle has taken place. Instead, it should look at the facts surrounding the transaction to determine if appellant attempted to obtain the property of another through artiface, trick, device, or any other means. *Id.* at 860.

We also deal here with the question of the "value" of the property obtained by the swindle, but we approach the question from a different perspective. Here there is a question of whether there ultimately would be anything to be stolen.

Lack of value as a defense to theft has not been addressed by this court. Other jurisdictions have held that if a theft fails because of some condition unknown to appellant, the criminal attempt has still been committed. *Gargan v. State*, 436 P.2d 968 (Alaska 1968) (defendant who was caught attempting to rob a coin box could not use as a defense to attempted larceny the fact that the coin box was empty); *People v. Fiegelman*, 33 Cal.App.2d 100, 91 P.2d 156 (1939) (defendant could not use as a defense to attempted grand theft the fact that the pocket he intended to pick did not contain the money he was attempting to steal).

Under *Lone*, the facts surrounding the transaction determine whether an attempt to obtain another's property has taken place. The value of that property is determinative of the degree of the offense, not whether the offense actually took place. Here, it is undisputed that appellant, through planned concealment of his involvement and other deception, attempted to buy zinc concentrate from Cargill on his own behalf and resell the zinc concentrate on terms that would give him, not Cargill, any profit made. Appellant argues he could have lost money as well as made money. However, he concedes that if he made any money, by his own design, it would go to him and not Cargill. The evidence shows that if appellant had succeeded in selling the zinc concentrate, he could have made a significant profit. Although his scheme was uncovered before any profit was realized, and thus we agree there is no "certainty" that appellant would have succeeded in reselling the zinc concentrate, we still find mens rea and criminal intent.

There was sufficient evidence for the jury to determine the profit which appel-

lant would have gotten had he succeeded in his attempt. Its determination of value of at least "over $35,000" is, when viewed in the light of the deference given juries on disputed questions of value, supported by the record.

■ The second element at issue is appellant's intent. Theft by swindle requires the intent to defraud. *See State v. Belfry,* 353 N.W.2d 224, 226 (Minn.App.1984), *pet. for rev. denied* (Minn. Oct. 30, 1984).

Appellant, while recognizing there was a conflict of interest, maintains he was making a good faith attempt to get Cargill a fair price for the zinc concentrate. He testified he had no intent to defraud the company. However, the jury was not required to credit his exculpatory evidence. *See State v. Berry,* 309 N.W.2d 777, 784 (Minn.1981).

There was evidence surrounding the creation of Balmer Trade, Ltd., which included:

1. Appellant was aware that his career at Cargill was at an end;

2. Appellant purchased a "shell company" under a false identity;

3. Appellant concealed his identity as a principal of Balmer; and

4. Appellant continuously fabricated that Balmer was affiliated with Marc Rich, a well-respected zinc concentrate trader.

Appellant wrote a contract by which Balmer would buy zinc from Cargill at one set of terms, and he immediately sent out proposals from Balmer to sell zinc to other buyers at another set of terms. The difference between the two sets of terms, if consummated, would have led to a significant profit for appellant rather than Cargill.

These facts support inferences that the terms in the Cargill contract did not reflect what appellant knew to be true market value, that the terms were intentionally unfair to Cargill, and that appellant intended to personally profit from unfair terms.

The jury heard extensive evidence from reliable witnesses from both parties as to the value of the property in question and as to intent to defraud.

[I]t is well-settled in Minnesota that it is the province of the jury to determine the credibility and weight to be given to the testimony of any individual witness.

*State v. Engholm,* 290 N.W.2d 780, 784 (Minn.1980) (citations omitted).

The jury had the benefit of a fairly tried presentation of claims and defenses. The evidence, when viewed in the light most favorable to the verdict, is sufficient to support a verdict of guilty.

II.

*Defense Requested Jury Instruction*

Appellant alleges the trial court erred by not giving his proposed jury instructions on intent, theory of the defense, and the definition of property as it applied to the facts of this case. Whether or not to give a proposed jury instruction is within the discretion of the trial court. The decision will be overturned only upon a showing of an abuse of that discretion. *State v. Safranski,* 391 N.W.2d 44, 46 (Minn.App.1986).

■ Appellant asked for a specific instruction on intent. He also asked for a second instruction entitled "Mistake or carelessness not an offense." Instead, the court gave general instructions which included a definition of intent and an extensive discussion of its application to theft by swindle.

The trial court is not required to give a party's proposed jury instruction if it determines that the substance of the request is contained in the court's charge. *State v. Ruud,* 259 N.W.2d 567, 578 (Minn.1977), *cert. denied* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). It is clear all defendants are entitled to an instruction on their theory of the case, if there is evidence to support it. However, specifically requested instructions may be rejected by the trial court if the substance of the proposed instruction is otherwise adequately presented in the court's charge. *Id.* at 578.

It was reasonable for the trial court to find its instructions encompassed both appellant's requested instructions and that

the requested instructions, although helpful, were not essential.

■ Appellant also asked for the following instruction entitled "Theory of the defense instructions."

Mr. Saybolt denies that he attempted to commit theft against Cargill, Inc. He states that, while he created a conflict of interest by offering to sell zinc concentrates to his own company, the terms of the contract were fair and reasonable in light of all of the facts and circumstances that existed on October 27, 1987. Accordingly, he maintains that there was no attempted theft, but a proposed sale at terms that were equivalent to what Cargill would obtain on the then existing market.

The trial court ruled that appellant's plea of not guilty was an adequate statement of this point, and it denied appellant's request. This ruling was wrong. A defendant's mere plea of "not guilty" is not a sufficient statement to the jury of that defendant's theory of the case. A defendant is entitled to more, and in this case, he was given more. Appellant had a full opportunity to argue his case to the jury, and the trial court did not commit reversible error by refusing to give the specifically requested instruction.

■ Appellant submitted an instruction as to the meaning of the term "property" which the court also refused to give. The court did not define the term property in its instruction. Appellant alleges this was error.

There was considerable dispute during the trial as to exactly what property was at the heart of the swindle. The probable cause figure in the complaint indicates that the property in question was the guaranteed profits of approximately $562,000. The state's expert witness testified in terms of a profit of around $300,000. During closing arguments, the state argued in terms of a profit of approximately $380,-000. It also argued in terms of obtaining possession of the zinc concentrate itself; in terms of a profit of at least $1.00 per ton for a total of $20,000; and that the theft of credit for a period of 30 days would be enough for a swindle.

[T]he trial court has an obligation to clearly instruct the jurors on exactly what it is that they must decide.

*Rosillo v. State*, 278 N.W.2d 747, 749 (Minn.1979). There is evidence that the jury, while deliberating, was at least initially confused about whether the term property should be taken literally or whether it referred to the "so-called profits." When a note was given to the court for clarification of the term, the court, after consultation with the parties, circled the term "so-called profits."

However clear it might be that the trial court should have given a better initial instruction on property, appellant must show he was prejudiced by the failure to do so. *See id.* The court should have given an instruction on the term property. It did not. However, the trial court was able to clarify the nature of the property in its response to the jury's inquiry during deliberations. The value of that property was a question of fact to be determined by the jury. On the question of value, much testimony was presented by both sides. The trial court's lack of an initial instruction to the jury on the term "property" did not cause incurable prejudice and does not mandate a new trial.

Jury instructions are to be viewed in their entirety to determine whether they fairly and adequately explain the law of the case. *State v. Stafford*, 385 N.W.2d 392, 397 (Minn.App.1986), *pet. for rev. denied* (June 19, 1986). The instructions given in this case, as a whole, were not prejudicially defective.

### III.

*Jury Oath*

■ Minn.Stat. § 358.07 (1986) provides that an oath "shall be administered" to petit juries in criminal cases in the prescribed form.

The required oath is not a mere "formality" which is required only by tradition. The oath represents a solemn promise on the part of each juror to do his duty

according to the dictates of the law to see that justice is done. This duty is not just a final duty to render a verdict in accordance with the law, but the duty to act in accordance with the law at all stages of trial. The oath is administered to insure that the jurors pay attention to the evidence, observe the credibility and demeanor of the witnesses and conduct themselves at all times, as befits one holding such an important position. The oath is designed to protect the fundamental right of trial by an impartial jury. *People v. Pribble*, 72 Mich.App. 219, 224, 249 N.W.2d 363, 366 (1976) (mistrial granted because jury was never sworn in); *see also People v. Bestle*, 22 Misc.2d 1088, 197 N.Y.S.2d 820 (N.Y.Co.Ct.1960) (failure to swear a jury necessitated a retrial); *Steele v. State*, 446 N.E.2d 353 (Ind.App.1983) (reversible error committed in denying motion for a mistrial based on Court's failure to swear a jury).

In this case, inadvertently, the oath was not administered until after testimony had closed and just prior to closing arguments. It is clear that had appellant objected to the late swearing in and asked for a mistrial at this point, the error would have been preserved and a new trial would be in order. The language of *Pribble* is persuasive. Oaths are not formalities, are sacred, and no citizen need expose himself to loss of liberty and property by people who are *not sworn* to do their duty. However, appellant made no timely objection or motion for mistrial based on the late swearing in. We therefore must examine the issue in light of whether fundamental or incurable error was committed.

The failure of a defendant to raise an issue at trial constitutes a forfeiture of his right to have this court consider the issue on appeal, unless failure to do so would perpetrate a substantial injustice in the sense that an innocent person may have been convicted. *State v. Beard*, 288 N.W.2d 717, 718 (Minn.1980). Appellant did raise the issue of the unsworn jury in his motion for a new trial. The supreme

court has held that when allegedly improper or prejudicial evidence has been admitted without objection, a party may not object to its admissibility for the first time in a motion for a new trial or on appeal. *Helm v. El Rehbein & Son, Inc.*, 257 N.W.2d 584, 587 n. 2 (Minn.1977). Here, there is no showing that the late swearing in of the jury affected the trial in any manner. There is no claim of actual prejudice, and we find none. Although the late swearing in was error, we find no substantial injustice, no fundamental error, and no incurable prejudice to appellant. Therefore, appellant is precluded from now raising this issue because of his failure to object or move for a mistrial during the trial when the issue was ripe.

IV.

*Variance of the Evidence*

■ Appellant contends that there was a fatal variance between the allegations in the complaint and the proof offered by the state during trial. He argues the complaint alleged a theft of a potential guaranteed profit of $562,000, while the testimony and argument in the trial offered a variety of different descriptions of the property and profit involved. A variance such as this can be fatal only if it deprives the defendant of the opportunity to prepare a defense. *State v. Dickson*, 309 Minn. 463, 467, 244 N.W.2d 738, 741 (1976).

Appellant in this case was charged with attempted theft by swindle of over $35,000. We cannot find a high estimate of the extent of the theft in the probable cause portion of the complaint was to appellant's detriment.[1] Appellant was aware of the exact nature of the transaction in question, cognizant of the possibility of great profit, and the testimony of his own witnesses reveals he was aware of the impossibility of citing with exactitude the potential profit from his contemplated buy/sell. Appellant had sufficient information and opportunity to prepare and argue his defense. We find no fatal variance between the alle-

---

1. Although complaints are read to juries, there is a specific instruction given pointing out that complaints themselves are not evidence and

should not be held against a defendant. Crim. JIG 1.01.

gations and the proof presented at trial. Appellant was afforded his right to present a full defense to the charge.

DECISION

Affirmed.