STATE of Minnesota, Respondent,

v.

Lowell Dale KRAMER, Appellant.

No. C7–88–1292.

Court of Appeals of Minnesota.

June 6, 1989.

Review Denied Aug. 9, 1989.

C. Paul Jones, State Public Defender, Bradford W. Colbert, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., James B. Early, Sp. Asst. Atty. Gen., St. Paul, and David W. Peterson, Lyon County Atty., Peter J. Kasal, Sp. Asst. County Atty., Marshall, for respondent.

Considered and decided by FOLEY, P.J., NIERENGARTEN and IRVINE, JJ., without oral argument.

## OPINION

FOLEY, Judge.

This appeal is from convictions for theft and theft by swindle arising out of the marketing of Jerusalem artichokes by American Energy Farming Systems (AEFS). We affirm in part and reverse in part, vacating the conviction for theft.

## FACTS

Appellant Lowell Dale Kramer was hired in January 1982 by AEFS as a business consultant on the Jerusalem artichoke sales operation. AEFS, which was owned by James Dwire and Fred Hendrickson, had only begun sales the previous fall of seed contracts to "third year growers." Under the agreement, the farmer received artichoke seed in exchange for a cash payment. The farmer agreed to release all marketing rights to AEFS, which would also receive 50% of the gross sales price of the seeds harvested, which were to be sold, on behalf of the third-year growers, to "second-year growers." AEFS also would develop markets for the end product, particularly the artichoke tubers.

The third year grower signed a "crop growing agreement" which disclaimed any warranties or guarantees of the number of second year growers AEFS could sign. The agreement promised AEFS' best efforts to market the grower's crop, including research and development of end markets for use of the artichoke as a food and fuel. The agreement provided the "principle motive" of both parties was "the growing of sufficient crops of tuber seedstock to expand the Jerusalem Artichoke for energy, feed and fuel."

The artichoke growers' agreements were sold in part through growers meetings, for both potential and already committed growers, at which Kramer's role, as a former evangelist, was to give a motivational message. At these meetings, third-year growers were told AEFS was putting some of its cash receipts into an escrow account to ensure they would get paid when their seed was harvested. The meetings had a religious tone, and growers were assured the company was acting in their best interests, a claim some accepted because the owners were "professing Christians." In a generally depressed farm economy, the third-year grower contracts sold extremely well, causing AEFS to extend a planned cut-off. The company sold approximately 450 contracts by May 1982, taking in large amounts of cash. AEFS' accountant testified the company took in over $20 million in grower payments by May 1983.

AEFS presented three basic selling points: (1) the farm uses of the artichoke, principally as feed; (2) the market for seeds for second-year and first-year growers; and (3) the eventual market of the end product, including conversion to alcohol for fuel and use as a foodstuff. There was testimony the growers were told, at growers meetings in which Kramer participated, not only of an escrow account, but also of substantial sums being spent on research and development of end product markets. Farmers were assured these markets would be in place at the end of the three years to which the "third-year growers" committed themselves.

AEFS, as a result of an investigation by the state of South Dakota, was required to include a disclaimer that the grower contract was not a security, and was for agri-

cultural, not investment purposes. However, the prime selling point was as an investment in yet-to-be-developed markets. Farmers were told they could make a $160,000 profit on a 20–acre planting.

The state presented testimony that Kramer, though nominally a consultant billing his services, was actually Dwire's "right hand man," and that the two were inseparable. Kramer, a member of AEFS' advisory board, spent virtually all his time on projects related to the company. He was present at meetings with AEFS' accountants in late 1982 and early 1983, when the partners were advised to repay their withdrawals and advances from the company in light of its imminent financial obligations to third-year growers.

The state presented evidence that Kramer, in addition to his billings as a consultant, obtained about $140,000 in cash from AEFS between January 1983 and AEFS' bankruptcy in May 1983. Kramer testified these payments were for seed delivered by limited partnerships in which Kramer had an interest, either personally through his company, L.D. Kramer and Associates, or through a company established by Dwire and Kramer, Challenge Funds, Inc. (CFI).

CFI financed growers who were turned down by AEFS' credit committee. CFI would "purchase" artichoke seed from AEFS and furnish it to these farmers in exchange for promissory notes and a percentage of the crop. CFI, however, never paid AEFS for the seed, except by assigning promissory notes from these growers, who were originally considered credit risks.

The state introduced evidence of substantial cash withdrawals made by Dwire and Hendrickson. AEFS' accountant testified he warned the partners in November 1982, at a meeting attended by Kramer, that these cash withdrawals had to be repaid. Instead of returning the withdrawals, Dwire attempted to remedy the mismanagement of AEFS finances by urging third-year growers to recruit more second-year growers to buy seed.

Kramer also participated in Dwire's withdrawals through Dwire Enterprises, which was owned by Dwire but received funds from AEFS by wire transfer. Although Kramer had no ownership interest, he signed most of the checks, which totaled $123,000. Some of this money went to Dwire's personal use. One check was used to purchase Hillcrest Leasing, which became the sole property of Kramer. Hillcrest was used to lease cars and planes to AEFS. Kramer personally leased a used Cadillac through Hillcrest.

CFI also obtained a percentage of the crop, as did Kramer personally, by entering into limited partnerships with farmers who could not afford the full investment. When these growers were rejected by the "credit committee," they were referred to Kramer, who suggested the limited partnership scheme, which involved a split of the harvest. Kramer or CFI would then supposedly pay part of the purchase price of the seed, although no money was actually received by AEFS, and the farmer would execute a promissory note for the rest. When the seed was harvested and delivered to AEFS, many of these partners received nothing, while Kramer was receiving "advances" on these sales.

Kramer made two preliminary objections before trial. First, he objected to the use of electronic recording equipment rather than the court reporter stenographically recording testimony. The court, noting Kramer had not objected in pretrial proceedings, overruled it. Kramer also moved the court to remove itself, for prejudice, because it had previously found Kramer's attorney in contempt for trying to delay the trial date. The court denied the motion, stating no prejudice had arisen from the contempt proceeding.

The complaint did not charge Kramer with aiding and abetting. The trial court, however, allowed evidence of withdrawals made by Dwire and Hendrickson after the state introduced evidence of Kramer's awareness of them. The court indicated it would instruct the jury that the withdrawals made by the partners were not attributable to Kramer. The court gave an instruction on accomplice liability, then instructed the jury:

You cannot use that evidence [of the partners' withdrawals] to find the defendant guilty * * * unless you also find that he aided in the withdrawals * * *.

Kramer was convicted of both counts and sentenced to concurrent terms of 12 and 15 months, each stayed, with one year of probationary jail time.

## ISSUES

1. Did the trial court err in failing to remove itself for alleged prejudice?

2. Was the recording of the trial by electronic recording equipment rather than by stenographic means reversible error?

3. Did the trial court, by instructing the jury on accomplice liability, abuse its discretion in permitting an amendment to the complaint?

4. Was the evidence sufficient to support the convictions?

## ANALYSIS

1. Kramer contends the trial judge should have removed himself from the case because the judge had earlier found Kramer's public defender in contempt. Kramer did not file a notice to remove, Minn.Stat. § 542.16, subd. 2 (1988), but did make a motion on the record before trial.

■ A judge's prior adverse ruling in a case is not sufficient to show prejudice which would disqualify the judge. *Olson v. Olson,* 392 N.W.2d 338, 341 (Minn.Ct. App.1986) (citing *U.S. v. Anderson,* 433 F.2d 856, 860 (8th Cir.1970)). While a finding of contempt may suggest an animus not present in the ordinary adverse ruling, our review of the record confirms the trial court's finding that no prejudice lingered from the contempt proceeding. There was no abuse of discretion in denying the motion to remove.

2. Kramer contends the trial court erred in relying on electronic recording equipment to record the trial.

The applicable statute provides:

Subd. 4. **Limitations on use of electronic recording equipment.** A competent stenographer who meets minimum qualifications promulgated by the supreme court shall make a *complete stenographic record* of the following court proceedings:

(1) Felony * * * offenses * * *.

(2) District court jury trials.

Minn.Stat. § 484.72, subd. 4 (1988) (emphasis added). After this statute was enacted, the supreme court issued an amended order defining minimum qualifications for court reporters, as follows:

The Supreme Court hereby adopts the following Minimum Qualifications for Court Reporters:

"A competent stenographer who wishes to be considered for employment by a judge for the position of court reporter must have a high school diploma or the equivalent and also qualify under one of the following classifications:

### I.

"A. Graduated from a court reporting school approved by the National Shorthand Reporters Association and the State Court Administrator, or have held the position of official court reporter for three of the previous five years; and

"B. A valid Registered Professional Reporters certificate or the ability to meet those standards required by the R.P.R. to the satisfaction of the State Court Administrator.

### II.

"A person appointed by the trial court pursuant to Minn.Stat. § 486.01 or Minn. Stat. § 487.11, Subd. 2; and who is capable of furnishing the accurate recording of court proceedings by any method including (a) stenographic machine; (b) electronic recording equipment; (c) Pitman shorthand; or (d) any other appropriate and reasonable device; and who is thereafter capable of promptly furnishing an accurate transcript as required by Rule 110.02 of the Rules of Civil Appellate Procedure.

### III.

"A person duly appointed and serving as a court reporter as of the date of this order pursuant to M.S. § 486.01 for judges of district court or M.S. § 487.11, Subd. 2, for judges of county court."

Amended Order of Minnesota Supreme Court (Dec. 29, 1981), *reprinted in* 27 Minn.Stat.Ann. at 87 (Supp.1989). As Kramer's trial counsel conceded, the trial court, as well as other trial court judges, relied on this order in using electronic recording equipment in their courtrooms.[1]

Kramer does not claim the transcript is inaccurate. He claims several bench conferences were not recorded and that the trial court refused to place on the record a discussion of the proposed jury instructions, particularly the aiding and abetting instruction. Kramer, however, does not challenge any evidentiary rulings. The record, moreover, reflects rejection of an on-the-record discussion, and adequately presents the issue of whether an aiding and abetting instruction should have been given. *See* Minn.R.Crim.P. 26.03, subd. 18(3) (requiring objections to instructions and rulings on them to be on the record).

■ It is not this court's function to determine the superiority of either electronic recording or recording by stenographic means. Pursuant to the supreme court's order, and absent a showing the transcript is inaccurate or incomplete so as to affect the substantial rights of Kramer, we must affirm. *See* Minn.R.Crim.P. 31.01 (harmless error rule). Any attempt to change or clarify either the rule or the statute must be addressed to the supreme court and the legislature. We conclude the sole use of electronic recording equipment over objection was at most harmless error, and absent a showing of prejudice, the sanction of a new trial is too severe.

■ 3. Kramer contends the trial court, by adding an instruction on "aiding and abetting," in effect permitted an amendment to the complaint at the close of the

evidence, thereby violating Minn.R.Crim.P. 17.05, because this amendment charged a different offense, prejudicing the substantial rights of Kramer. There is no separate offense of "aiding and abetting" a criminal offense because it is not a substantive offense. *See State v. Britt,* 279 Minn. 260, 264, 156 N.W.2d 261, 263 (1968). However, an amendment may "charge a different offense" if it changes an element of the crime to be proven. *See Gerdes v. State,* 319 N.W.2d 710, 712 (Minn.1982); *State v. Manley,* 353 N.W.2d 649, 651–52 (Minn.Ct. App.1984).

In principle, the addition of an "aiding and abetting" instruction could change one element—the act the state must prove was committed by the defendant. However, the offense of swindling covers a broad range of conduct. *State v. Ruffin,* 280 Minn. 126, 130, 158 N.W.2d 202, 205 (1968). The offense cannot always be defined in terms of a single act which would make the actor the principal and other participants aiders and abettors. *See id.* (theft by swindle statute is intended to proscribe a form of conduct rather than a specific act); *see generally State v. Strimling,* 265 N.W.2d 423, 426 (Minn.1978) (partners criminally liable for diverting corporate property chargeable only with aiding and abetting specific act of submitting false report). That is particularly the case with an operation as complex as the Jerusalem artichoke scheme.

Kramer was deeply involved in both the selling of grower contracts and the diversion of AEFS assets. As discussed below, we conclude the sum of his acts in the swindle was sufficient to make him criminally liable as a principal. We believe the jury was not likely influenced by the instruction on accomplice liability to convict Kramer solely for acts committed by the partners. Although the court allowed evidence of the partners' withdrawals from AEFS, Kramer was personally involved in some of Dwire's diversion of AEFS assets

---

1. We assume that a qualified court reporter supervised the electronic recording pursuant to this supreme court order.

by writing checks on the Dwire Enterprises account.

■ 4. Kramer contends the evidence supporting his conviction of theft by swindle is insufficient because he was not an officer of AEFS, because he personally made none of the representations relied upon by the growers, and because his advances, authorized by the partners, were legitimate. In determining the sufficiency of the evidence, this court must examine the evidence in the light most favorable to the state and assume the jury believed the state's witnesses and discredited contrary evidence. *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981).

Kramer's argument that he was not liable for the swindle because he was not an owner or officer of AEFS is without merit. A swindle of this complexity was not confined by the corporate organization chart. The supreme court has stated, in rejecting a similar claim by non-officers accused of diverting corporate property:

> In the realm of closely held corporations, the role of the silent strong man is a familiar one. The statute recognizes this common phenomenon by not expressly restricting its language to officers, directors, employees or the like.

*Strimling,* 265 N.W.2d at 430 (footnote omitted). The broad charge of swindling is even less subject to this limitation. The evidence established that Kramer was an AEFS "insider" obtaining cash advances and "buying" AEFS seed, without paying, even as the company was sliding into bankruptcy and Kramers' limited partners were receiving no money for seed actually delivered.

The state did not show Kramer personally made the representations constituting the sales pitch. Nor did it establish Kramer's advances were unauthorized disbursements. However, Kramer obtained partnership interests and money beyond his billings as a business consultant from the sales of grower contracts, sales made at least in part through his participation as a motivational speaker. Kramer, moreover, was an insider involved in basic business decisions at AEFS. As such, he knew the growers were sold on the Jerusalem artichoke as an investment on which they could make substantial profits by their collective efforts in vastly increasing the *supply* of Jerusalem artichokes while relying on AEFS' exclusive marketing program to develop commensurate demand. *See State v. Ulvestad,* 414 N.W.2d 737, 740 (Minn.Ct. App.1987), *pet. for rev. denied* (Minn. Jan. 15, 1988) (victims of odometer tampering swindle testified mileage was a major factor in their purchases). The jury could have concluded Kramer was participating in a swindle by continuing to sell this investment knowing of the massive withdrawals, mismanagement and minimal marketing effort occurring at AEFS, and knowing of the continued misrepresentations to the growers of an escrow account and the "best efforts" of AEFS in marketing the artichoke. *See generally, State v. Lone,* 361 N.W.2d 854, 859–60 (Minn.1985) (it is not a defense to a charge of swindle that the victim receives something of value); *State v. Hanson,* 285 N.W.2d 483, 487 (Minn.1979) (evidence that defendant took cash deposits on sales of jeeps he never acquired was sufficient to establish a swindle).

■ The state also charged Kramer with the taking of artichokes from an AEFS warehouse in Appleton, Minnesota and a Nebraska collection center. The state claimed this property, at the time, was owned by AEFS or, alternatively, by the growers who had harvested it.

The state could produce evidence only that Kramer had admitted being paid for the Appleton artichokes upon their delivery. However, Kramer was receiving seed "advances" from AEFS. Although the other Laidlaw partners who were entitled to did not receive payments for this seed, this was the case with virtually all the growers, and tended to prove a theft by swindle, not a theft by taking.

■ The same analysis applies to the seed collected in Nebraska and delivered for planting in Arkansas. Additionally, the state failed to prove any part of this transaction occurred within the State of Minne-

sota. *See State v. Smith*, 421 N.W.2d 315, 319–20 (Minn.1988) (no jurisdiction to prosecute an offense where no operative event occurs within the state). Since there was insufficient evidence of a theft, we need not address Kramer's argument against multiple sentencing.

## DECISION

The trial court did not err in failing to remove itself. Recording of the trial by non-stenographic means was not reversible error. The addition of an aiding and abetting instruction did not prejudice appellant. The evidence was sufficient to support the theft-by-swindle conviction, but not the theft conviction, and we vacate that conviction.

Affirmed in part and reversed in part.

IRVINE, Judge (Dissenting).*

I respectfully dissent.

As stated by the majority, Minn.Stat. § 484.72, subds. 4(1) and (2) provide that electronic recording equipment may not be used to record the trial of felony offenses or district court jury trials. The language of the statute does not appear to allow for any variation from its wording. It would seem that if there is to be any variation, it should be provided by the legislature.

I would reverse and order a new trial using a "live" reporter.

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

