*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0993**

State of Minnesota,
Respondent,

vs.

John F. Bonner, III,
Appellant.

**Filed March 14, 2016
Affirmed
Chutich, Judge
Dissenting, Cleary, Chief Judge**

Hennepin County District Court
File No. 27-CR-14-22213

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County
Attorney, Morgan D. Kunz, Assistant County Attorney, Minneapolis, Minnesota (for
respondent)

Jon M. Hopeman, Jessica M. Marsh, Felhaber Larson, Minneapolis, Minnesota (for
appellant)

Considered and decided by Cleary, Chief Judge; Ross, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant John Bonner challenges his conviction for theft by swindle based on

(1) the sufficiency of the evidence, (2) the prosecutor's conduct during closing arguments,

and (3) evidentiary rulings by the district court allowing a witness to testify about the Employment Retirement Income Security Act. Because we conclude that the state presented sufficient evidence to prove theft by swindle, the prosecutor did not commit prosecutorial misconduct, and the district court's evidentiary rulings did not substantially influence the jury's decision to convict Bonner, we affirm.

## FACTS

Bonner and two attorneys started a small law firm in September 1999, which, in 2000, became known as Bonner & Borhart. By 2009, and through January 2012, five attorneys worked for Bonner & Borhart including Bonner, Robert Borhart, Thomas DeVincke, Kim Chapman, and Patrick Leach.

In June 2000, the firm set up a simple individual retirement account (IRA) plan to provide benefits for its employees. The plan allowed employees to choose to contribute a percentage of their salary to their IRA and to defer the tax on that income until retirement. The firm then matched the employee's contribution up to three percent.

Under the plan and federal law, the firm was responsible for deducting the employee contributions from their paychecks and then forwarding both the employer match and the employee contributions to American Funds (the financial company that ran the IRA). Every pay period, an independent bookkeeping company created checks, payable to American Funds, for Bonner's signature that represented the amounts taken out of the participating employees' paychecks. Once Bonner signed and forwarded the checks, American Funds would then invest the employees' retirement money into their retirement accounts.

The firm operated financially in the following manner. Bonner, as the managing partner, paid the other attorneys in the firm out of present funds based on the number of hours they billed for a particular paycheck period and the rate at which they billed those hours. If the client paid and the payment resulted in a profit, Bonner would typically pay a percentage of that profit to the attorney that billed the hours and keep the remaining profit.

From 2000 to 2009, the firm made a profit and had a high collection rate for client fees. The collection rate, and consequently the profit margin, dropped in 2009, and the firm's financial situation worsened considerably in 2010 and 2011.

DeVincke, one of two associate attorneys who the jury found had been swindled by Bonner, began working for the firm in 2000. DeVincke started an IRA under the firm's plan as soon as it was set up in 2000. His employee IRA contributions as well as the firm's matching contributions were always made through 2009. But in 2010, despite deducting these contributions from DeVincke's salary, Bonner did not make the IRA contributions for DeVincke or the other associates until November 26, 2010. Bonner then made a lump-sum catch-up payment to cover the outstanding employee IRA contributions that had been deducted from their paychecks, but had not been forwarded throughout the year to American Funds.

Despite Bonner's failure to make the IRA contributions until late November, DeVincke's pay stubs, generated by ADP, a separate company, listed deductions for the IRA contributions throughout all of 2010. No contributions were made to DeVincke's IRA from August 23, 2011, to January 31, 2012, the period the criminal charges covered (the charge period). During this time, DeVincke's pay stubs still included a deduction from his

3

salary for his employee IRA contribution. During the charge period, Bonner chose not to forward to American Funds DeVincke's employee contributions in the amount of $4,791.65.

In 2010, Bonner asked DeVincke to help him handle the firm's payroll. At this time, the firm did not always have enough money to pay the associates in full each month. Bonner worked out a "pro rata reduction" to pay the attorneys what he deemed the firm could afford. Bonner decided how much money the firm had available to pay the employees each pay period; using that amount, DeVincke then calculated the percentage that each employee could be paid, taking into consideration hours worked and billing rates, and DeVincke informed ADP of the numbers.

Bonner also chose to pay the firm's bills each month in a particular order. He paid the non-attorney staff members first, then the operating costs, then the other attorneys, and then himself. Bonner did not receive any salary in normal payroll in 2010 or 2011, but withdrew money to cover his health insurance, parking, spousal support, and malpractice insurance. Despite sharing twenty-five percent of the ownership with Borhart,[1] one of the attorneys testified that Bonner "was the only person bearing risk."

DeVincke testified that he had "little to no input" on which bills of the firm got paid, and he was not involved in Bonner's decision to forego sending the associates' IRA-contribution checks to American Funds. He further testified that because he had conversations with Bonner about the employee IRA contributions, he knew that Bonner

---

[1] From 2000 to January 2012, Bonner owned seventy-five percent of the firm and Borhart owned twenty-five percent.

4

was not forwarding those payments to DeVincke's retirement account in 2010 or 2011. Bonner did promise DeVincke to make a catch-up payment in 2011, but this payment was never made.

DeVincke left the firm in February 2012 to find a more financially stable firm. After he left, he sent an e-mail asking about the outstanding IRA contributions from 2011. Bonner replied that he had "no clue" what was due to DeVincke, "nor [did Bonner] know where to look."

Chapman, the other victim, joined Bonner & Borhart as an associate attorney in 2008. She set up her IRA on July 15, 2008, choosing to contribute ten percent of her monthly income each pay period. She continued to contribute ten percent (with a three percent match from the firm) until she reduced her salary deduction to three percent on November 1, 2010. She did so because she noticed that, although her pay stubs listed deductions for contributions to her IRA in 2010, the money was not actually being forwarded to her IRA. Chapman testified that she decided it "wasn't worth risking that money."

Chapman received the catch-up payment along with the other attorneys on November 26, 2010. But Bonner failed to make any of Chapman's employee-contribution payments during the charge period (amounting to $1,276.63). Chapman testified that when she received her paychecks showing an IRA deduction, she thought that the money went into her retirement account. She further testified that she never agreed that her salary deduction could be used to pay the firm's general expenses and that she had no control over her IRA contributions not being forwarded to her retirement account.

5

Chapman left the firm because it was "basically disintegrating" in February 2012. She then contacted the United States Department of Labor in April 2012, because she believed that Bonner was not going to pay her the contributions owed to her IRA. She sued Bonner and obtained a directed verdict for her outstanding wages, but not the IRA contributions.

The department started to investigate Chapman's complaint in July 2012. The investigation ultimately led to the state charging Bonner with one count of theft by swindle under Minnesota Statutes section 609.52, subd. 2(a)(4) (2014), based on his failure to pay the employee IRA contributions to American Funds from August 23, 2011, to January 31, 2012.

Throughout trial, Bonner's defense was that the state failed to prove that he defrauded, cheated, or made false representations to (i.e., swindled) the victims or intended to do so. When the state rested, Bonner moved for a "directed judgment of acquittal," which the district court denied. Bonner then rested without calling any witnesses. The jury convicted him and Bonner now appeals.

## D E C I S I O N

### I.

Bonner argues that the evidence was insufficient to convict him of theft by swindle. Specifically, he asserts that the evidence was insufficient to prove that (1) he performed an act that was a swindle and (2) he intended to swindle either DeVincke or Chapman.[2]

---

[2] He is not challenging that he obtained services from DeVincke or Chapman as defined by Minnesota Statutes section 609.52, subd. 1(9) (2014).

"Where there is a challenge to the sufficiency of the evidence, our review on appeal is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989).

A conviction based on circumstantial evidence receives heightened scrutiny.[3] *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). But "we still construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008). "The verdict will not be overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense." *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015).

We apply a two-step test to convictions based on circumstantial evidence. *Id.* First, we identify the circumstances proved by deferring to the fact finder and rejecting evidence in the record that conflicts with the circumstances proved by the state. *Id.* Second, we independently examine the reasonable inferences that might be drawn from those circumstances. *Id.* "We give no deference to the fact-finder's choice between reasonable inferences." *Id.* If the reasonable inferences are only consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt, then

---

[3] The parties and we agree that the conviction relies on circumstantial evidence concerning Bonner's intent.

the conviction must be sustained. *Id.* A successful challenge to the sufficiency of the evidence results in reversal of the conviction. *State v. Al-Naseer*, 788 N.W.2d 469, 471 (Minn. 2010).

Here, the state charged Bonner with felony theft by swindle. Under Minnesota law, a defendant is guilty of theft by swindle if he "obtains property or services from another person" by "swindling, whether by artifice, trick, device, or any other means." Minn. Stat. § 609.52, subd. 2(a)(4) (2014). To prove the swindling act, the state had to provide evidence of an "affirmative fraudulent or deceitful behavior" on behalf of the defendant. *State v. Flicek*, 657 N.W.2d 592, 598 (Minn. App. 2003). A misrepresentation of a present intention to perform a future act can amount to affirmative fraudulent behavior if the promisor had no intention to perform the future act when the misrepresentation was made. *Vandeputte v. Soderholm*, 298 Minn. 505, 508–09, 216 N.W.2d 144, 147 (1974). The state also had to prove that Bonner had "an affirmative intent to defraud." *State v. Pirsig*, 670 N.W.2d 610, 615 (Minn. App. 2003), *review denied* (Minn. Jan. 20, 2004). The intent element is generally proved with circumstantial evidence, and the jury is in the best position to evaluate the evidence regarding intent. *State v. Davis*, 656 N.W.2d 900, 905 (Minn. App. 2003), *review denied* (Minn. May 20, 2003).

The jury found that the state proved that Bonner obtained property or services valued over $5,000. This amount exposed Bonner to a more severe sentence than if he had stolen less than $5,000. *Compare* Minn. Stat. § 609.52, subd. 3(2) (2014) (outlining harsher penalties for theft of property or services valued above $5,000), *with* Minn. Stat. § 609.52, subd. 3(3) (2014) (outlining lesser penalties for theft of property or services

8

above $1,000 but below $5,000). It is undisputed that neither one of the victims suffered a loss greater than $5,000 alone, but together they suffered a loss over $5,000. If the state failed to present sufficient evidence to prove either the theft by swindle from DeVincke or Chapman, then the jury's finding that Bonner obtained property or services over $5,000 is also unsupported and the lesser penalties of Minnesota Statutes section 609.52, subd. 3(3) apply. We therefore analyze the two victims separately.

## A.    DeVincke

First, construing conflicting evidence in the light most favorable to the verdict, we must determine the circumstances proved that support the conviction for theft by swindle. The state proved that DeVincke signed up under the firm's IRA plan shortly after he joined the firm. As the managing partner and business owner, Bonner had fiduciary obligations by contract and federal law to persons participating in the firm's IRA plan to promptly forward their contributions to the associates' retirement accounts. Bonner was responsible for signing the checks issued to pay his employees' salary, the checks that forwarded his employees' contributions to their individual retirement accounts, and the checks that paid the firm's bills. An independent bookkeeping company created checks to pay the associates' IRA contribution and sent them to Bonner each pay period, but he chose not to sign them. Bonner was the person responsible for prioritizing the payment of these obligations. He never asked DeVincke or Chapman if they would allow him to forego forwarding their IRA contributions to American Funds, and DeVincke had no say in that decision.

9

The circumstances proved further showed that Bonner did not make employee IRA contributions in 2010 to DeVincke and Chapman, and that Bonner caught up by making a lump-sum payment at the end of the year. No similar catch-up payment was made for the IRA contributions missed during the charge period, despite Bonner promising DeVincke that he would make such a payment. When DeVincke asked Bonner to make those payments after DeVincke left the firm, Bonner replied that he had no clue how much he owed or even how to find out. In fact, Bonner told a federal investigator that he did not pay the employee IRA contributions deducted from the paychecks of DeVincke and Chapman because they had clients that did not pay their fees. Bonner stated that DeVincke and Chapman "didn't deserve to have their monies sent to the retirement plan."

The circumstances proved also included bank statements that showed large sums of money (nearly $100,000) entering and exiting at least one of Bonner & Borhart's operating bank accounts each month over the charge period. The account was never negative. And, in every month except for one during the charge period, the account had at least $10,000 in it. Bonner never paid DeVincke's employee IRA contributions from the charge period (totaling $4,791.65).

Second, we must determine if those circumstances are consistent with guilt and inconsistent with any rational hypothesis other than guilt. Bonner asserts that these proved circumstances do not exclude the reasonable inference that his decision to prioritize other business expenses was motivated by a lack of funds and his attempt to keep the law firm functioning, and not by an intent to defraud. But these motives are not mutually exclusive. "[P]ossibilities of innocence do not require reversal of a jury verdict so long as the evidence

10

taken as a whole makes such theories seem unreasonable." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002) (quotation omitted). By knowingly taking money deducted from DeVincke's paycheck—which was specifically designated for DeVincke's retirement account under the firm's IRA benefit plan—to pay bills of the firm, including his own personal expenses; by failing to keep his promise to DeVincke that he would make a catch-up payment in 2011; by failing to even know how much he had taken of DeVincke's retirement money during the charge period; and by telling the investigator that DeVincke and Chapman did not deserve their retirement money, Bonner betrayed the associates' trust and deprived them of their retirement funds. Moreover, by not making DeVincke's employee IRA contributions, Bonner secured DeVincke's services for less than what he promised to pay DeVincke.

In sum, the circumstances proved support the swindling conviction and are inconsistent with any other rational hypothesis. We conclude that the evidence was sufficient to support Bonner's conviction of theft by swindle from DeVincke.

**B. Chapman**

The circumstances proved concerning Chapman include many listed above for DeVincke. In addition, the state showed that, during the charge period, Chapman had no knowledge that Bonner was diverting her retirement funds to pay for the firm's bills and his expenses. Her pay stubs listed deductions for employee IRA contributions during the charge period, and she testified that she accordingly believed that those contributions were being made. Chapman testified that Bonner never informed her that her employee IRA contributions were not being forwarded to her retirement account. She did not agree with

11

the decision to divert her retirement funds and, as an associate, she had no control over Bonner's decision to do so. The checks necessary to forward Chapman's employee IRA contributions to her retirement account were presented to Bonner every pay period, but every pay period Bonner chose not to sign them. By trial, Bonner still had not paid the $1,276.63 that he owed Chapman's retirement account for her IRA contributions during the charge period, and he told an investigator that she did not deserve them.

We must next determine if those circumstances are consistent with any alternative rational hypothesis other than guilt. Given Chapman's lack of consent to divert the funds and her lack of knowledge that Bonner had diverted them, the misrepresentations in her pay stubs sufficiently prove the act of swindle.

Concerning his intent, Bonner asserts that he cannot be held responsible for the misrepresentations in the pay stubs because he did not create them and did not know that they listed those deductions. But Bonner did not have to make the false representations himself to be guilty of theft by swindle so long as he was the one responsible for them. *See State v. Kramer*, 441 N.W.2d 502, 507–08 (Minn. App. 1989) (upholding a conviction— even though the state did not prove that the defendant himself made the misrepresentation—because he was responsible for the misrepresentation as an "insider involved in basic business decisions" at the company that made the misrepresentations), *review denied* (Minn. Aug. 9, 1989).

As the managing partner in charge of the firm's finances, Bonner was responsible for the misrepresentations in Chapman's pay stubs that showed that money was deducted from her salary to make her employee IRA contributions. He knew that he had never talked

12

with her about using, or sought her permission to use, her IRA contributions for other purposes. And he certainly knew that money was being deducted from every Chapman paycheck for the IRA contributions because he chose not to sign the prepared checks that would have transferred the salary deduction to Chapman's retirement account. He also knew when he decided not to sign these checks that large sums of money were going in and out of the firm, the amount that he owed to Chapman to fund her IRA contribution was minuscule in comparison (totaling approximately $1,200), and that it was his sole decision to prioritize bills, including his expenses, over funding her retirement contributions. Moreover, his behavior was purposeful because he told the investigator that his motive for not making the contributions was that Chapman did not deserve them. In sum, the circumstances proved support Bonner's conviction for theft by swindle from Chapman, and are inconsistent with any other reasonable hypothesis.

## II.

Bonner argues that the prosecutor committed misconduct by misstating the law to the jury during closing arguments. Bonner did not object on these grounds at trial, however. We apply a modified plain-error doctrine when examining unobjected-to prosecutorial misconduct. *State v. Ramey*, 721 N.W.2d 294, 299–300 (Minn. 2006).

Under this doctrine, the burden is first on Bonner to show that the "error occurred and that the error was plain." *Id.* at 302. "An error is plain if it was 'clear' or 'obvious.'" *Id.* (quoting *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002)). "Usually this is shown if the error contravenes case law, a rule, or a standard of conduct." *Id.* A misstatement of law during closing arguments can support a conclusion that plain error

13

occurred. *See Strommen*, 648 N.W.2d at 689 (noting that it was "improper" for the prosecutor to represent to the jury that evidence supporting the defense's theory was irrelevant). In examining closing arguments for prosecutorial misconduct, we look at the closing argument as a whole, rather than just selective phrases or remarks. *State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993).

If Bonner meets his burden, then the burden shifts to the state to show the prosecutor's misconduct did not prejudice the jury. *Ramey*, 721 N.W.2d at 299–300. If these prongs are met, then we assess whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings. *Id.* at 302.

Bonner relies on three statements made by the prosecutor to support his argument:

- The victims were the employees. They did not know what was going on, or they had limited information. So does the fact that one of [the alleged victims] may have known something about what was happening affect this case? I posit to you, ladies and gentlemen, that it does not.

- Well, ladies and gentlemen, look carefully at the elements of a theft by swindle. The word "defraud" is not in there. There's nothing in there about what the victims knew.

- [T]he [defense's] closing argument that we heard focused on basically the same issue . . . all of [it] comes back to the same question, what did the victims know and when did they know it?
  Well I made this argument when I started and I'll make it again now. That's not an element of the crime. It's not relevant to your considerations what they knew and when they knew it.

Bonner argues that these statements misstated the law of theft by swindle because the state must prove that the victims did not know that Bonner was keeping their employee

14

IRA contributions. As stated above, to prove theft by swindle the state must present evidence that a defendant made an intentional misrepresentation to a victim to obtain the victim's property or services. *Flicek*, 657 N.W.2d at 598. Imprudence of the victim, however, is not a defense to theft by swindle. *See State v. Hanson*, 285 N.W.2d 483, 486 (Minn. 1979). The victim's knowledge is relevant only to the extent that it shows whether the defendant made a misrepresentation to the victim.

The first statement Bonner relies on from the prosecutor's closing argument contains an assertion of what the facts show about how much DeVincke and Chapman knew about what Bonner was doing. The prosecutor then argued that just because the victims knew something about what was happening does not mean they were so fully informed that there was no swindle. He followed up by discussing the state of the victims' knowledge and how it was insufficient to prevent a swindle from taking place. Taken in context, the prosecutor was arguing that Bonner made misrepresentations to the victims that were not corrected and swindled money and services from them.

The second statement Bonner relies on starts with a declaration that the word "defraud" is not an element of a theft by swindle. The prosecutor finished the statement by saying nothing in the elements concerns a victim's knowledge. It is true that the word "defraud" is not in the statute and it was not in the jury instructions given by the district court. Minn. Stat. § 609.52, subd. 2(a)(4). It is also true the statute contains no explicit reference to the victim's knowledge and the district court did not mention it as an element. Taken in isolation, these statements imply that the victim's knowledge was irrelevant. But the prosecutor clarified what he meant over the next few minutes of his closing argument,

15

> [T]he next part of [the swindle] element, [is that] it is not necessary that Kimberly Chapman and Thomas DeVincke had a special confidence in the defendant. And this is what I was talking about before, where there's no aspect of this instruction that has to do with Ms. Chapman or Mr. DeVincke's knowledge.

He also discussed the swindle element and how it required the state to prove that Bonner cheated another person by deliberate artifice or scheme. He then described the misrepresentations in the pay stubs to the employees and the promise to make a catch-up payment.

Finally, Bonner challenges the prosecutor's statement in his rebuttal about knowledge being irrelevant to the jury's considerations. This statement must also be understood in context. When the prosecutor made the statement, he had already clarified that the knowledge of the victims was irrelevant because the state did not have to prove the victims had a special confidence in DeVincke. He had also explained that imprudence of the victim is not a defense to theft by swindle; in other words, Bonner could not defend his actions by arguing that the victims should have known what was going on. The defense had just made an argument to that effect during its closing. The statement was made in response to that argument.

The prosecutor's argument focused on the elements of theft by swindle and applied the facts to those elements. We conclude, considering the prosecutor's closing argument as a whole, that the prosecutor's statements did not amount to plain error.

Even if Bonner had met his burden in establishing plain error, however, the state showed that any misconduct did not have a significant effect on the verdict of the jury.

16

When deciding if an error would have a significant effect on the verdict of the jury we consider three factors: "(1) the strength of the evidence against the defendant; (2) the pervasiveness of the improper conduct; and (3) whether the defendant had an opportunity (or made efforts) to rebut the prosecutor's improper suggestions." *State v. Hill*, 801 N.W.2d 646, 655 (Minn. 2011).

Here, the evidence was sufficient to support a conviction for theft by swindle. Furthermore, Bonner points to three statements out of an entire prosecution closing argument spanning 22 pages. And the prosecutor properly discussed the swindle element at length in his closing. The district court told the jury that it would instruct them about the rules of law that apply to the case, and it then instructed them about all elements of the case orally and in writing. The district court also instructed the jury that the attorneys' arguments or remarks were not evidence. Finally, the district court instructed the jurors, "If an attorney's argument contains any statement of law that differs from the law which I give you, you should disregard the statement." Moreover, the defense devoted most of its closing argument to emphasizing how knowledge was relevant to the jury's determination, which helped to correct any misunderstandings the jury might have had. Because we conclude that the prosecutor did not misstate the law and, even if prosecutorial error occurred, it did not significantly affect the jury's verdict, we do not assess whether the error should be addressed to ensure the fairness and integrity of the trial.

**III.**

Bonner argues that the district court erred when it allowed the state's witness to testify about the federal law that governs individual retirement accounts, the Employment

17

Retirement Income Security Act (ERISA). We review the district court's evidentiary rulings for an abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). If the district court abused its discretion and the "error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt." *State v. Davis*, 820 N.W.2d 525, 533 (Minn. 2012) (citation omitted). "If no constitutional right was implicated, we will reverse only if the district court's error substantially influenced the jury's decision." *State v. Vang*, 774 N.W.2d 566, 576 (Minn. 2009) (quotation and citation omitted).

Bonner argues that the harmless beyond a reasonable doubt standard applies because the cumulative effect of the alleged errors implicated his constitutional right to a fair trial. The cumulative effect of trial errors only implicates a defendant's right to a fair trial in "rare cases." *Davis*, 820 N.W.2d at 538. The errors must "tip the scales" and "operate to the defendant's prejudice by producing a biased jury." *Id.* (quotations omitted).

Here, Bonner contends that the district court improperly allowed the state's witness to testify about the requirements of ERISA. Specifically, Bonner asserts that the witness's testimony was improper when he stated that Bonner had a duty to hand over the employee IRA contributions "not only as a contract but also as rules under the plan document which he signed to establish the plan. And also under ERISA and Department of Labor regulations." But Bonner's defense was based on the swindle element of the theft-by-swindle charge. Bonner never asserted that he did not obtain services or property of the associates working for him, which is what the testimony about ERISA established. He never argued, for example, that he did not have to make the employees' IRA contributions.

18

Evidence, even if improperly admitted, establishing an element that was uncontested does not present the rare case that implicates a defendant's right to a fair trial.

Because this fact was uncontested, Bonner also failed to show that the evidentiary rulings substantially influenced the jury's decision. The ERISA testimony defined who owned the employee IRA contributions, and consequently, showed that Bonner had no right to withhold them. But Bonner's defense from his opening statement to his closing argument was that he did not swindle the two attorneys, not that he had a right to keep the funds. We therefore conclude that even if the district court abused its discretion in making its evidentiary ruling, the testimony did not substantially influence the jury's decision to convict Bonner of theft by swindle.

**Affirmed.**

19

**CLEARY,** Chief Judge (dissenting)

I respectfully dissent from the majority's opinion. I believe the evidence is insufficient to support appellant's conviction for theft by swindle.

As all agree, in order to prove felony theft by swindle, the state had to show (1) that appellant performed an act constituting a swindle from each attorney; (2) that he had an affirmative intent to swindle each of them; and (3) that appellant obtained property or services valued over $5,000. Minn. Stat. § 609.52, subds. 2(a)(4), 3(2) (2014); *State v. Flicek*, 657 N.W.2d 592, 598 (Minn. App. 2003). Employee DeVincke testified that he knew the firm was not making his IRA contributions (in the amount of $4,791.65), despite the listed deductions to his paychecks, because appellant consistently informed him of the failure to do so throughout 2010 and 2011. A person is not fraudulently tricked, cheated, schemed, or swindled out of his property or services by the defendant if the defendant has kept him informed consistently so as to correct any possible misrepresentations.[1]

The majority relies on appellant's expression of intent to DeVincke that he would make a catch-up payment and his failure to follow through with that payment as proof of the swindling act. But those proven circumstances do not exclude all rational or reasonable hypotheses other than guilt. A misrepresentation of a present intention can amount to a fraud; however, a stated intention does not become a fraud "merely because the represented

---

[1] The state argues that DeVincke's knowledge only goes to his imprudence, and that imprudence of a victim who is swindled is not a defense. Appellant is not arguing that DeVincke should have discovered the swindle. He is arguing that DeVincke knew throughout the period in question that the contributions were not being made because appellant kept him informed.

act or event did not take place." *Vandeputte v. Soderholm*, 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974). The state must prove that the appellant "had no intention to perform at the time the promise was made." *Id.* at 508, 216 N.W.2d at 147; *see also State v. Lone*, 361 N.W.2d 854, 857 (Minn. 1985) ("[O]ne cannot commit a swindle if he honestly believes that what he is saying is true. If you find a defendant reasonably and honestly believed the statement to be true, then he cannot be convicted on the basis of that statement, even if it is false.").

The rational hypothesis inconsistent with guilt is that the representation that appellant made to DeVincke was sincere and that he had every intention of making good on his promise. DeVincke testified that the firm was struggling financially throughout 2010 and 2011.[2] As much as appellant wanted to make the payments as evidenced by his advocacy for keeping the employee IRA plans, he could not do so because the firm lacked the funds. His failure to follow through on his earlier representation did not suggest fraud or swindle.

The majority relies on the amount of money the firm had in one of its bank accounts to support an inference that the firm had access to money but decided not to make the

---

[2] The lack of a present intent not to perform the promised future act is also why the state cannot rely solely on the IRA agreements signed by the employees to prove the swindling acts. There is no evidence to show that appellant did not intend to make the contributions when the employees signed up for the IRAs. In fact, the evidence showed that he had made all of the contributions until 2010, when the firm started to have financial troubles. DeVincke testified that the firm paid people to the maximum extent that they could each month without bankrupting the firm: "either we had the money in the account or we didn't. It was a matter of numbers." It was only after the onset of these financial problems that appellant was unable to make further employee IRA contributions.

employee IRA contributions anyway. The bank statements entered into evidence did show money was in the operating account. However, there is more than one inference surrounding the existence of the money in that account. There was no testimony that explained the deposits or withdrawals made to or from the account. The money could well have been left in there to pay bills that were due in the early part of each month. Another reasonable inference that can be drawn is that some of the money was left in the account to cover unexpected obligations that could arise which might threaten the ability of the firm to remain an ongoing concern. These hypotheses are inconsistent with guilt and are consistent with other evidence, given DeVincke's testimony about his conversation with appellant over how much money was in the firm's account, followed by payments to each attorney to the maximum extent possible without bankrupting the firm.

Finally, there is appellant's statement to the investigator that he felt DeVincke and Chapman did not deserve to have their monies sent to their retirement plans because they had a negative balance. The statement, in the context of the other proven circumstances, gives rise to several reasonable inferences. First, the statement did not necessarily prove motive for failing to make the payments since it also can be interpreted as an explanation for cash flow problems—which was the first reason appellant gave the investigator for not making the payments. Second, there is nothing in the record that indicates when appellant formed his belief that the attorneys did not deserve the employee IRA contributions. Appellant was not asked the question about why he had not made the employee IRA contributions until September 2012. At that point, the two attorneys had already left the firm. The reasonable inference inconsistent with guilt is that appellant only later felt such

payments were unjustified, given the attorneys' failure to keep positive balances followed by their respective exits from the firm. If appellant formed the belief after he stated his intention to make the second catch-up payments, then those circumstances do not support his conviction for theft by swindle because the evidence does not show that he had a present intent not to follow through on his promise.

All of these circumstances support another reasonable, rational hypothesis inconsistent with guilt. Appellant ran out of enough money to continue to make the IRA payments and keep the law firm afloat. He did not make an intentional misrepresentation; he simply could not make the payments. The evidence fails to suggest appellant had an intent to swindle.[3]

To support appellant's conviction for theft by swindle from Chapman, the majority relies almost exclusively on the checks she received from ADP that included listed deductions for employee IRA contributions. Chapman testified that she believed the contributions (in the amount of $1,276.63) were being made based on the deductions. However, Chapman was aware of earlier problems surrounding contributions to her IRA, due to law firm cash flow, which led to a catch-up payment for 2010, and prompted her to change the amount she contributed to her paycheck from ten percent to three percent because it "wasn't worth risking the money." Although she had notice of problems in the

---

[3] The state argues that good faith is not a defense to theft by swindle. It is true that if there is an act of swindle and the person performing that act intentionally makes a misrepresentation, but does so with good intentions—the person is still guilty of a theft by swindle. But that is not what appellant is arguing as a defense. Appellant is arguing that he never made a misrepresentation because he intended to make the contributions and he always kept the attorneys informed of the financial situation.

funding of her IRA going forward, she testified that she never checked to see if the contributions were being made to her account in quarterly statements or online. The majority recognizes that appellant did not create those checks, but concludes that he was responsible for any misrepresentations in the checks because he was the managing partner in charge of the firm's finances.

To reach its conclusion, the majority relies on *State v. Kramer*, 441 N.W.2d 502, 507 (Minn. App. 1989), *review denied* (Minn. Aug. 9, 1989). *Kramer* involved a business that made several misrepresentations as part of its sales pitch to potential customers. *Id.* at 503-04. These misrepresentations allowed the business to amass nearly $20 million in revenue from 1981 to 1983. *Id.* at 503. The defendant was a consultant and "right hand man" to one of the two owners of the business. *Id.* at 504. As a consultant, and former evangelist, his job was to make motivational speeches with religious overtones to potential customers in order to persuade them to make the deals. *Id.* at 503. He profited immensely from the scheme—making hundreds of thousands of dollars from 1981 to 1983. *Id.* at 504. Most critically, there was evidence to support the fact that he knew the company was making the misrepresentations. He was present for meetings in which they were discussed, yet he continued to play his part in the complex swindle. *Id.* at 507. Although the state did not prove that Kramer personally made misrepresentations, he was held responsible in part for the company's misrepresentations. *Id.*

This case is distinguishable from *Kramer*. In this case, the state failed to prove that appellant personally made any misrepresentations or that he was aware that any misrepresentations were taking place. Kramer's awareness was shown; here, the state has

not proved that awareness. Appellant was not making representations to the attorneys to pull the veil over their eyes. No one testified that appellant knew that the ADP printouts listed a deduction for the employee IRA contributions. When DeVincke contacted him to collect his outstanding employee IRA contributions, appellant told him that he had "no clue . . . where to look" to get that information. While it is certainly arguable that he should have been more involved in the payroll aspects of the law firm, this is a criminal charge with a specific intent requirement, "[o]ne cannot commit a swindle by accident or by negligence." *Lone*, 361 N.W.2d at 857.

Theft by swindle is a broad crime that was "intended to reach cheats and swindlers of all kinds and descriptions." *State v. Wells*, 265 Minn. 212, 214, 121 N.W.2d 68, 69 (1963). I do not believe it is so broad that it encompasses the circumstances that were present in this case. The theft-by-swindle convictions this court has affirmed in the past involved considerably more egregious and clear-cut criminal acts than found here.

This is a case that should have been handled primarily through civil litigation and perhaps through professional discipline, rather than through the criminal justice system. At the very least, the state failed to present sufficient evidence to prove appellant committed a theft "by swindling" as defined in Minn. Stat. § 609.52, subd. 2(a)(4). The evidence lacks any indicia of deception on the part of appellant. I would reverse this conviction.